PATRICIA A. KRAFICK v. JOHN H. KRAFICK
(15043)

PETERS, C. J., and BORDEN, BERDON, NORCOTT and PALMER, Js.

---

Argued April 18—decision released August 8, 1995

*David S. Maclay,* for the appellant (plaintiff).

*Daniel P. Weiner,* with whom, on the brief, was *Dan M. Schacht,* for the appellee (defendant).

*Maureen M. Murphy, Ruth L. Pulda, Janet M. Degnan, Nancy Engberg, Misty Farris, Lisa Levy* and *Jo Seavey* filed a brief for the Connecticut Women's Education and Legal Fund et al. as amicus curiae.

NORCOTT, J. The principal issues in this certified appeal are whether vested pension benefits constitute property for the purposes of equitable distribution pursuant to General Statutes § 46b-81,[1] and, if so, what methods are appropriate by which to value such benefits. The plaintiff, Patricia A. Krafick, appealed to the Appellate Court from the judgment of the trial court dissolving her thirty-three year marriage to the defendant, John H. Krafick, and distributing the parties' marital assets. The Appellate Court affirmed the judgment of the trial court without opinion. *Krafick* v. *Krafick*, 34 Conn. App. 930, 643 A.2d 314 (1994).[2] We granted certification[3] and now reverse the judgment of the Appellate Court.

[1] General Statutes § 46b-81 provides: "ASSIGNMENT OF PROPERTY AND TRANSFER OF TITLE. (a) At the time of entering a decree annulling or dissolving a marriage or for legal separation pursuant to a complaint under section 46b-45, the superior court may assign to either the husband or the wife all or any part of the estate of the other. The court may pass title to real property to either party or to a third person or may order the sale of such real property, without any act by either the husband or the wife, when in the judgment of the court it is the proper mode to carry the decree into effect.

"(b) A conveyance made pursuant to the decree shall vest title in the purchaser, and shall bind all persons entitled to life estates and remainder interests in the same manner as a sale ordered by the court pursuant to the provisions of section 52-500. When the decree is recorded on the land records in the town where the real property is situated, it shall effect the transfer of the title of such real property as if it were a deed of the party or parties.

"(c) In fixing the nature and value of the property, if any, to be assigned, the court, after hearing the witnesses, if any, of each party, except as provided in subsection (a) of section 46b-51, shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

[2] The plaintiff's initial appeal to the Appellate Court was dismissed for lack of final judgment. Thereafter, the plaintiff moved in the trial court for a final judgment, which was subsequently rendered.

[3] We granted certification limited to the following issues: (1) "In a dissolution action, is a vested defined benefit pension a part of the prop-

The relevant procedural and factual background is as follows. The parties were married on December 27, 1958. During the first twenty years of their marriage, the plaintiff worked in the home, caring for the parties' seven children. She reentered the paid workforce in 1979 to work part-time in a bakery. In 1981, she obtained a full-time position with the Danbury welfare department as a case worker, where she subsequently was promoted to assistant director. The plaintiff's 1992 earnings from this position were approximately $36,000.

The defendant worked as a teacher, first in the Danbury school system and subsequently in the Bedford, New York school system. He retired on February 1, 1994, shortly after the parties' marriage was dissolved, after thirty-four years of service. In addition, the defendant worked as a full-time seasonal night dispatcher at a fuel company and held a number of other short-term summer jobs. The defendant's 1992 total earnings were approximately $79,000.

After several years of growing dissatisfaction with their relationship, the parties separated in February, 1991. In August, 1991, the plaintiff instituted this marriage dissolution action seeking a decree of dissolution, alimony and the assignment of certain property from the defendant's estate, including a 50 percent interest in the defendant's pension by way of a qualified domestic relations order (QDRO).[4]

---

erty that must be equitably distributed?'' and (2) ''If the first issue is answered 'yes,' what is the proper method for valuing the pension?'' *Krafick* v. *Krafick*, 231 Conn. 920, 648 A.2d 164 (1994).

[4] A QDRO is the exclusive means by which to assign to a nonemployee spouse all or any portion of pension benefits provided by a plan that is governed by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. See 29 U.S.C. § 1056 (d) (3) (b) for the requirements of a valid QDRO. Although the procedures set forth in the United States Code for a QDRO do not apply to a governmental pension plan such as the state teachers' plan from which the defendant derives his pension; see 29 U.S.C.

The parties' financial affidavits disclosed that, in addition to the family home,[5] the parties owned a retail liquor business,[6] a summer cottage in Old Saybrook[7] and several "individual assets," including personal vehicles and savings and checking accounts.[8] The parties also claimed as "deferred assets" their respective retirement plans. The plaintiff had two individual retirement accounts with a total value of $8374 and a pension from the city of Danbury.[9] The defendant had a 401k plan from his job as a dispatcher, valued at

§ 1003 (b); the amicus represents that the New York state teachers' retirement system will honor court orders, similar to a QDRO, that direct the payment of a portion of a retiree's retirement allowance to a spouse.

[5] An appraiser for the plaintiff testified that the value of the home, as of the date of trial, was approximately $175,000. The home was encumbered by a $100,000 mortgage loan, which had been taken to purchase the retail liquor store owned by the parties.

[6] This business was purchased and stocked for approximately $87,000 with the proceeds of the $100,000 mortgage against the home. The parties disputed the value and profitability of the business. The plaintiff estimated the value of the business to be between $40,000 and $45,000, based on her knowledge of similar businesses in the area having been listed in that range. The defendant estimated the value of the business to be approximately $87,000. The parties' income tax return showed that the business had gross receipts in excess of $200,000 in 1990, but that overall, the business operated at a loss. The plaintiff indicated at trial that the proceeds from the business paid a large part of the mortgage payments on the family home.

[7] The plaintiff was part owner, with her brother, of the summer cottage, which had an estimated fair market value of $135,000. The defendant disputed the size of the plaintiff's interest in the property by producing town records, showing that the plaintiff owned two thirds of the property. The plaintiff and her brother testified that they were each one-half owners. The defendant conceded at trial that he had understood his wife to possess a one-half interest in the cottage.

[8] The plaintiff owned two automobiles with a total value of $7325, a savings account in the amount of $6377, a Christmas club savings account in the amount of $200, two checking accounts in the amounts of $629 and $106, and shares of stock valued at $360. The defendant listed as individual assets a truck valued at $3000 and a boat valued at $13,000, against which there was an outstanding loan in the amount of $11,000.

[9] A letter from the director of finance of the city of Danbury stated that "the value of your pension as of June 30, 1992, at age 65 would be $511.00 per month. If you were to retire early (June 30, 1992), your estimated pension would be $222.00 per month."

$30,500, an early retirement bonus in the amount of $16,200 and a pension from the New York state teachers' retirement system, which would pay him 61 percent of the average of his three highest years of salary upon retirement, but which he claimed had "no present cash value."[10]

At trial, two documents addressing the nature and value of the defendant's teacher's pension were introduced as exhibits. The first was a letter from the teachers' retirement system benefits department that was addressed to the defendant. The letter explained that the pension fund was entirely employer funded and that contributions were not allocated to individual members in the form of an annuity savings account. Instead, benefits were calculated pursuant to a preset formula, based on the member's total years of service and the average of the member's three highest years of salary.[11] The pension vested at twenty years of credited service.[12]

---

[10] The defendant's financial affidavit listed the following "deferred assets/savings": a 401k retirement plan with the fuel company valued at $33,531; an early retirement bonus valued at $16,200; miscellaneous IRAs worth $5000 total; a savings account with a $1100 balance; and his pension. The defendant requested that he be awarded exclusive interest in these assets "in the approximate amount of $55,831." Thus, it is clear that the defendant placed no value on the pension for purposes of property distribution.

[11] The defendant explained that the percentage he would receive, upon retirement, of the average of his three highest years of salary would be the sum of 1 percent for each year he taught in Connecticut and 2 percent for each year he taught in New York.

[12] By "vested" we refer to pension interests "in which an employee has an irrevocable . . . right, in the future, to receive his or her account balance (under a defined contribution plan), or his or her accrued benefit (under a defined benefit plan), regardless of whether the employment relationship continues." 3 Family Law and Practice (A. Rutkin ed., 1995) § 36.13 [2], p. 36-71; see id., § 37.11 [1] [b], pp. 37-157 through 37-159; see also 2 Valuation and Distribution of Marital Property (J. McCahey ed., 1991) § 23.02 [2] [a], p. 23-8; see *Thompson* v. *Thompson*, 183 Conn. 96, 100 n.3, 438 A.2d 839 (1981) ("[v]ested benefits . . . refer to those accrued benefits to which the employee has a nonforfeitable right to receive at retirement age whether

The plaintiff also introduced an expert appraisal of the defendant's pension performed by Law Data, Inc. The appraisal stated that the defendant was fully vested in the pension and it projected, on the basis of his retiring on the eve of trial, that his annual pension income would be $36,500. On the basis of the defendant's age and life expectancy, the appraisal further stated that the present value of the pension was $420,981. The defendant did not contest this appraisal nor did he introduce an alternative calculation of the pension's present value or its projected yearly payout. Instead, he stressed that he could not liquidate the pension nor receive any payments from it until he retired. The defendant indicated at trial that he was eligible to retire and that he intended to do so in June, 1994.

On November 19, 1992, the trial court rendered judgment dissolving the parties' marriage on the ground of irretrievable breakdown.[13] Pursuant to General Statutes §§ 46b-81 and 46b-82,[14] however, the trial court

---

or not he is in the service of the employer at that time"). Prior to vesting, an employee's accrued benefits may be forfeited by termination of employment. Once the employee with a vested pension interest reaches the age of retirement and elects to retire, his rights are said to be vested and matured. See 3 Family Law and Practice, supra, § 36.13 [2], p. 36-71, and § 37.11 [1] [b], p. 37-159; see also *Majauskas* v. *Majauskas*, 61 N.Y.2d 481, 491, 463 N.E.2d 15, 474 N.Y.S.2d 699 (1984).

[13] The trial court made no findings in its memorandum of decision or elsewhere in the record as to the value it accepted for any of the parties' various assets, the total value of all of the assets or the total distributed to each party, or as to any percentage of the assets it intended to award to each party.

[14] General Statutes § 46b-82 provides: "ALIMONY. At the time of entering the decree, the superior court may order either of the parties to pay alimony to the other, in addition to or in lieu of an award pursuant to section 46b-81. The order may direct that security be given therefor on such terms as the court may deem desirable, including an order to either party to contract with a third party for periodic payments or payments contingent on a life to the other party. In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall hear witnesses, if any, of each party, except as provided in subsection (a) of section 46b-51, shall consider the length of the marriage, the causes for the

made the following division of the parties' property and award of support. The plaintiff was awarded the family home, most of the household furniture and furnishings, her interest in the Old Saybrook property, and the retail liquor business. Additionally, the defendant was ordered to pay to the plaintiff $300 per week in alimony, secured by a QDRO against his pension.[15] The defendant received $30,000 "as and for a property distribution." The parties retained their "respective bank accounts, securities, IRA plans and respective pension rights free and clear of any claims of the other, subject only to the [QDRO]." In addition, the parties were made equally responsible for payment of any existing debt, but were individually responsible for any other liabilities shown on the affidavits. Lastly, the parties were ordered to exchange life insurance policies, each worth approximately $50,000.

Thereafter, the plaintiff filed a motion to open and clarify the trial court's judgment.[16] General Statutes § 52-212 (a); see Practice Book §§ 329, 4051 and 4061. She contended that the trial court's disposition of the marital assets was inequitable, in that, according to her calculations, it awarded the defendant 87 percent of the assets and the plaintiff only 13 percent.[17] The plain-

annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability of such parent's securing employment."

[15] Under the court's order, in the event that the defendant failed to pay the plaintiff's alimony, his pension payments would be garnished in the amount of $300 per month.

[16] In his brief to this court, the defendant argued that the plaintiff had waived review of the pension valuation issue because she had not raised it with sufficient specificity in her motion to open and clarify. Our review of the record, however, indicates that the plaintiff's motion satisfactorily raised the pension valuation issue before the trial court.

[17] According to the plaintiff's schedule of assets attached to the motion, when present value of the pension was added to the value of the assets

tiff sought clarification of the basis of the court's property distribution, particularly whether the trial court had found the plaintiff to be at fault. She also asked the trial court to address difficulties encountered in using a QDRO to reach the pension merely as security for alimony, rather than awarding her as a QDRO a percentage interest in the pension itself. See 29 U.S.C. § 1003 (b) (1) (Employee Retirement Income Security Act [ERISA] does not apply to governmental employee benefit plans).

At the hearings on the plaintiff's motion, the trial court confirmed that it had intended to award the plaintiff no interest in the pension other than as security for the defendant's alimony obligation. Despite the plaintiff's repeated attempts, the trial court refused to state the basis of its property distribution or to articulate the value, if any, that it had ascribed to the defendant's pension. The trial court acknowledged that the pension was an asset, but indicated that because it did not have a liquidated value, it was not amenable to reliable valuation and, therefore, was not considered alongside other assets in distributing the marital property.[18]

received by the defendant, she calculated that he received $538,293 in property and that she received assets worth only $79,059.

[18] For example, the following exchange occurred during one of the hearings: "[Plaintiff's counsel]: Your Honor, two things occurred to me as being inherent premises in the court's order regarding this issue [of survivorship benefits]. One is, that the court perceives the pension as an asset that does not have a value. Or certainly does not have a value that is calculable at this point in time.

"The Court: Well, the pension does not have a value which a person can withdraw against."

Later the trial court stated: "I've heard both positions concerning—one says it's 70/30 the other says it's 13/87. The court is aware of the fact that has been from the first day that there is a pension to which some $400,000 was ascribed as its current value but—the court has heard that, but admittedly no one can say give me one dollar let alone $400,000. And the court took that into consideration that it wasn't a distribution to Mr. Krafick where he can say, great, she's got that and I've got $400,000 and I'm going to the New York state authorities and saying $400,000 please."

The Appellate Court, in a per curiam opinion, affirmed the judgment of the trial court.

On appeal to this court, the plaintiff claims that the trial court improperly failed to treat the pension as an asset, to assign it a value and to apportion it equitably. We agree.

I

The distribution of assets in a dissolution action is governed by § 46b-81, which provides in pertinent part that a trial court may "assign to either the husband or the wife all or any part of the estate of the other. . . . In fixing the nature and value of *the property*, if any, to be assigned, the court, after hearing the witnesses, if any, of each party . . . shall consider the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates." (Emphasis added.) This approach to property division is commonly referred to as an "all-property" equitable distribution scheme. See 3 Family Law and Practice (A. Rutkin ed., 1995) § 37.01 [2] [a] [v], p. 37-19. It does not limit, either by timing or method of acquisition or by source of funds, the property subject to a trial court's broad allocative power. A. Rutkin, E. Effron & K. Hogan, 7 Connecticut Practice Series: Family Law and Practice with Forms (1991) § 27.1, pp. 398–400.

There are three stages of analysis regarding the equitable distribution of each resource: first, whether the resource is property within § 46b-81 to be equitably distributed (classification); second, what is the appropri-

ate method for determining the value of the property (valuation); and third, what is the most equitable distribution of the property between the parties (distribution). The present case concerns the proper treatment of the defendant's vested pension under all three stages of our equitable distribution scheme.[19]

## A

We first consider whether pension benefits should be classified as property pursuant to § 46b-81. We conclude that they should.

We approach this question according to well established principles of statutory construction designed to further our "fundamental objective of ascertaining and giving effect to the apparent intent of the legislature." *State* v. *Kozlowski*, 199 Conn. 667, 673, 509 A.2d 20 (1986); *Hayes* v. *Smith*, 194 Conn. 52, 57, 480 A.2d 425 (1984). "In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to

---

[19] At this point, it is helpful to define the terminology we employ. Pension plans, although existing in many forms, are often grouped into two broad categories: defined contribution plans and defined benefit plans. What distinguishes them is the source and allocation of funding and the way in which benefits are calculated. 3 A. Rutkin, supra, § 36.13 [1], pp. 36-69 through 36-71; see also W. Troyan, E. Poll, W. Cantwell & W. Weston, 3 Valuation and Distribution of Marital Property (1991) §§ 45.08 through 45.10, pp. 45-26 through 45-32. Generally, "defined contribution plan" refers to a plan under which "contributions are made at a fixed rate, as defined in the plan, but the ultimate benefits are unknown. The important features of this type of plan are the maintenance of individual accounts and use of a plan formula to calculate allocations to the accounts." 3 Family Law and Practice, supra, § 36.13 [1], p. 36-70. In contrast, a "defined benefit plan" refers to a plan which is "funded to provide a definitely determinable benefit to the employee upon retirement. Contributions, therefore, are made in an amount that actuaries calculate will be required to yield the promised benefit, that is, a fixed amount per month upon retirement for the remainder of the employee's life. The plan trustees are not required to keep an individual account for each employee." Id. Plans may, of course, combine elements of both of these categories.

the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Frillici* v. *Westport*, 231 Conn. 418, 431–32, 650 A.2d 557 (1994); *Fleming* v. *Garnett*, 231 Conn. 77, 91–92, 646 A.2d 1308 (1994); *State* v. *Metz*, 230 Conn. 400, 409, 645 A.2d 965 (1994); *Ambroise* v. *William Raveis Real Estate, Inc.*, 226 Conn. 757, 764, 628 A.2d 1303 (1993).

The term "property" is not defined in § 46b-81 or elsewhere in the dissolution chapter. " 'Where a statute does not define a term, it is appropriate to look to the common understanding expressed in the law and in dictionaries.' " *Southington* v. *State Board of Labor Relations*, 210 Conn. 549, 561, 556 A.2d 166 (1989); see General Statutes § 1-1 (a); *Carpenteri-Waddington, Inc.* v. *Commissioner of Revenue Services*, 231 Conn. 355, 362, 650 A.2d 147 (1994); *State* v. *Indrisano*, 228 Conn. 795, 809, 640 A.2d 986 (1994); *State* v. *Jimenez*, 228 Conn. 335, 341, 636 A.2d 782 (1994).

Black's Law Dictionary (6th Ed. 1990) defines "property" as the term "commonly used to denote everything which is the subject of ownership, corporeal or incorporeal, tangible or *intangible*, visible or invisible, real or personal; everything that has an exchangeable value or which goes to make up wealth or estate. It extends to every species of valuable right and interest, and includes real and personal property, easements, franchises, and incorporeal hereditaments." (Emphasis added.)

"Pension benefits represent a form of deferred compensation for services rendered. *In re Marriage of Brown*, [15 Cal. 3d 838, 845, 544 P.2d 561, 126 Cal. Rptr. 633 (1976)]." *Thompson* v. *Thompson*, 183 Conn. 96, 100, 438 A.2d 839 (1981).[20] They do not constitute

---

[20] We reject the defendant's assertion that *Thompson* v. *Thompson*, supra, 183 Conn. 96, settled either the status of vested pension benefits under

mere gratuities; see *Pineman* v. *Oechslin*, 195 Conn. 405, 413, 488 A.2d 803 (1985); as the interest in receiving such benefits is contractual in nature. "Whether the plan is contributory or noncontributory, the employee receives a lesser present compensation plus the contractual right to the future benefits payable under the pension plan. . . . [Vested pension benefits] are contract rights of value . . . ." *Majauskas* v. *Majauskas*, 61 N.Y.2d 481, 491, 463 N.E.2d 15, 474 N.Y.S.2d 699 (1984). As contractual rights, pension benefits are "a type of *intangible* property," and, as such, are encompassed in Black's definition of "property." (Emphasis added.) 3 E. Farnsworth, Contracts (1990) § 11.1.

Nothing in the legislative history of § 46b-81 indicates an intent to narrow the plain meaning of "property" from its ordinarily broad and comprehensive scope. Indeed, the term "property" has been broadly defined elsewhere in the General Statutes. See General Statutes § 52-278 (for purposes of attachment, property is defined as "any present or future interest in real or personal property, goods, chattels or *choses in action*, whether such is vested or contingent." (Emphasis added.)

Interpreting the term property broadly is also consistent with the purpose of equitable distribution statutes generally. It is widely recognized that the primary aim of property distribution is to recognize that marriage is, among other things, "a shared enterprise or joint undertaking in the nature of a partnership to which both spouses contribute—directly and indirectly, financially and nonfinancially—*the fruits of which* are distributable at divorce." (Emphasis added.) J. Gregory,

---

§ 46b-81 or the proper valuation of such benefits. In *Thompson,* we addressed nonvested pension benefits and concluded only that such interests were not too speculative to be taken into account in some fashion by the trial court in crafting its financial orders in a dissolution action. Id., 100–101.

The Law of Equitable Distribution (1989) § 1.03, pp. 1–6; see *O'Neill* v. *O'Neill*, 13 Conn. App. 300, 310–11, 536 A.2d 978, cert. denied, 207 Conn. 806, 540 A.2d 374 (1988).

Pension benefits are widely recognized as among the most valuable assets that parties have when a marriage ends. *In re Marriage of Brown*, supra, 15 Cal. 3d 846 ("[a]s the date of vesting and retirement approaches, the value of the pension right grows until it often represents the most important asset of the marital community"); *Deering* v. *Deering*, 292 Md. 115, 122–23, 437 A.2d 883 (1981) ("[I]t is significant that over the past several years, pension benefits have become an increasingly important part of an employee's compensation package which he or she brings to a marriage unit. Moreover, in a situation where economic circumstances prevent a husband and wife from saving or investing a portion of the wage earner's income, the pension right swells in importance as retirement or vesting approaches, and may well represent the most valuable asset accumulated by either of the marriage partners."); see also *In re Marriage of Grubb*, 745 P.2d 661, 664 (Colo. 1987); *Barbour* v. *Barbour*, 464 A.2d 915, 920 (D.C. 1983). Pension benefits are an "economic resource acquired with the fruits of the wage earner spouse's labors which would otherwise have been utilized by the parties during the marriage to purchase other deferred income assets." *Deering* v. *Deering*, supra, 124. "Both the nonemployed spouse and his or her wage earning marital partner have the same retirement goals and expectancies regarding the pension benefits as they would if they provided for their later years by using wage income to purchase other investments." Id., 125. It would be unfair and contrary to the purpose of the statute to "strip the nonemployee spouse of the value of the retirement asset by precluding [the trial court] from evaluating its worth prior to

adjudicating the property rights of the estranged marriage partners." Id. Thus, it would not make sense, where the legislature has acted to expand the range of resources subject to the trial court's power of division, to adopt a narrow construction of the operative term "property."

Classifying vested pension benefits as property does not run afoul of the limitation, recognized in the context of inheritance and trust interests, that § 46b-81 applies only to presently existing property interests, not "mere expectancies." See *Bartlett* v. *Bartlett*, 220 Conn. 372, 380–81, 599 A.2d 14 (1991); *Rubin* v. *Rubin*, 204 Conn. 224, 236–39, 527 A.2d 1184 (1987). An expectancy is only "the bare hope of succession to the property of another, such as may be entertained by an heir apparent." *Krause* v. *Krause*, 174 Conn. 361, 365, 387 A.2d 548 (1978). As we have stated, " '[s]uch a hope is inchoate. *It has no attribute of property*, and the interest to which it relates is at the time nonexistent and may never exist.' " (Emphasis added.) Id. "The expectancy may never be realized because of diminution of the donor's wealth or a change in the planned disposition of his property." *Rubin* v. *Rubin*, supra, 235. "The term expectancy describes the interest of a person who merely foresees that he might receive a future beneficence . . . . [T]he defining characteristic of an expectancy is that its holder has no *enforceable right* to his beneficence." (Citations omitted; emphasis in original.) *In re Marriage of Brown*, supra, 15 Cal. 3d 844–45. As we have stated, vested pension benefits represent an employee's *right* to receive payment in the future, subject ordinarily to his or her living until the age of retirement. "The fact that a contractual right is contingent upon future events does not degrade that right to an expectancy." Id., 846 n.8.[21]

---

[21] Moreover, we are persuaded that pension benefits are sufficiently susceptible to valuation to distinguish them from the type of potential inter-

Thus, we conclude that "property" as used in § 46b-81,[22] includes the right, contractual in nature, to receive vested pension benefits in the future.[23]

est in money that might be received under a will whose validity is being contested. Cf. *Eslami* v. *Eslami,* 218 Conn. 801, 591 A.2d 411 (1991). In *Eslami,* although the trial court had failed to consider the value of the wife's vested interest in her father's estate, we affirmed the judgment of the trial court. We noted that, even though the wife's interest had been "vested" because her father had died, it was impossible to determine whether that interest had any value whatsoever. If the will was declared invalid, the wife would have been entitled only to an intestate share of the estate which might not have exceeded her liability for attorney's fees expended in the will contest. See id., 806 n.4. We therefore affirmed the judgment of the trial court, noting that "[a]lthough the interest involved here had vested in the wife at the time of trial, the court could reasonably have concluded that uncertainty as to the amount she would eventually receive from her father's estate militated against consideration of that interest for the purpose of the financial awards." Id., 807. In this case, the right to receive such benefits is not nearly so uncertain, as some benefits will be paid unless the defendant dies before retirement. Moreover, the problem of estimating the *value* of such benefits is more properly dealt with not as a problem of classification, but as a problem of valuation and distribution. See part I B of this opinion.

[22] To the extent that *Askinazi* v. *Askinazi,* 34 Conn. App. 328, 641 A.2d 413 (1994), may be read to permit various pension related interests to be considered either as property or as a source of alimony, we reject that conclusion. Section 46b-81 requires a trial court to make an equitable distribution of the parties' *property*; to go about doing so sensibly, a court must determine at the outset which of the parties' resources are subject to division and assignment under that provision. Although § 46b-82 authorizes the trial court to award alimony "in addition to or *in lieu of* [a distribution of property] pursuant to section 46b-81," (emphasis added), the trial court may decide to exchange alimony for property only *after* determining the value of the property in the estate.

This classification is significant for two reasons. First, property, even if not so characterized by the trial court, will ultimately be awarded to one of the parties; the statutory duty to distribute property equitably contemplates that the trial court effect such awards consciously rather than by default. Second, although it may be permissible in the distribution phase to exchange some form of alimony for a property award when equitable to do so; see part I B of this opinion; it must be remembered that these awards are of different quality and consequence for the recipient spouse. An award of property is final; the party who receives property pursuant to § 46b-81 owns it in his or her own right and controls it. Periodic alimony, on the other hand, is conditional, subject to modification or elimination. See General Statutes § 46b-86.

[23] Our conclusion that vested pension benefits, as contract rights to payment in the future, constitute property subject to distribution on divorce

## B

We next must determine how vested pension benefits should be valued and distributed. The task of properly valuing pension benefits is complex because such benefits may be defeasible by the death of the employee spouse before retirement and the amount of benefits ultimately received depends upon a number of factors that remain uncertain until actual retirement. Therefore, a trial court, in valuing the parties' assets upon dissolution, has considerable discretion in selecting and applying an appropriate valuation method. "In assessing the value of . . . property . . . the trier arrives at his own conclusions by weighing the opinions of the appraisers, the claims of the parties, and his own general knowledge of the elements going to establish value, and then employs the most appropriate method of determining valuation. . . . The trial court has the right to accept so much of the testimony of the experts and the recognized appraisal methods which they employed as he finds applicable; his determination is

is in accord with the overwhelming majority of jurisdictions—including common law, equitable and community property—reaching the issue. See, e.g., *In re Marriage of Brown*, supra, 15 Cal. 3d 838; *In re Marriage of Grubb*, supra, 745 P.2d 665; *Barbour* v. *Barbour*, supra, 464 A.2d 915; *Majauskas* v. *Majauskas*, supra, 61 N.Y.2d 481; *Stevenson* v. *Stevenson*, 511 A.2d 961, 965 (R.I. 1986); see also annot., 94 A.L.R.3d 176, 180 ("[w]hether or not they regard pensions or retirement pay as property which is subject to award to or division between spouses in settlement of their property rights, virtually all courts do recognize or assume, as an initial matter, that these benefits do constitute 'property' ")

   Although we do not reach nonvested pension benefits here, we note that the same reasoning has been applied to find that such benefits also, as an initial matter, constitute property. See *Laing* v. *Laing*, 741 P.2d 649 (Alaska 1987); *Johnson* v. *Johnson*, 131 Ariz. 38, 638 P.2d 705, modified and affirmed, 131 Ariz. 47, 638 P.2d 714 (1981); *In re Marriage of Brown*, supra, 15 Cal. 3d 838; *Robert C.S.* v. *Barbara J.S.*, 434 A.2d 383 (Del. 1981); *Deering* v. *Deering*, supra, 292 Md. 115 (rejecting as dispositive on issue of status as property the concept of vesting); *Whitfield* v. *Whitfield*, 222 N.J. Super. 36, 535 A.2d 996 (1987).

reviewable only if he misapplies, overlooks, or gives a wrong or improper effect to any test or consideration which it was his duty to regard." (Citation omitted; internal quotation marks omitted.) *Turgeon* v. *Turgeon*, 190 Conn. 269, 274, 460 A.2d 1260 (1983); see also *Siracusa* v. *Siracusa*, 30 Conn. App. 560, 568–71, 621 A.2d 309 (1993).

There are three widely approved methods of valuing and distributing pension benefits. The first, called the "present value" or "offset" method, "requires the court to determine the present value of the pension benefits, decide the portion to which the nonemployee spouse is entitled, and award other property to the nonemployee spouse as an offset to the pension benefits to which he or she is otherwise entitled." 3 Family Law and Practice, supra, § 36.13 [3], p. 36-72; see *In re Marriage of Brown*, supra, 15 Cal. 3d 848 (recognizing offset method); *In re Marriage of Grubb*, supra, 745 P.2d 666 (same); *Robert C.S.* v. *Barbara J.S.*, 434 A.2d 383, 387–88 (Del. 1981) (same); *Kikkert* v. *Kikkert*, 177 N.J. Super. 471, 477–78, 427 A.2d 76, aff'd, 88 N.J. 4, 438 A.2d 317 (1981) (same); *McDermott* v. *McDermott*, 150 Vt. 258, 259–60, 552 A.2d 786 (1989) (same); see also 3 Family Law and Practice, supra, § 37.11 [2] [a], pp. 37-161 through 37-163, and § 38.04 [2] [f], pp. 38-39 through 38-42. For defined benefit pensions, present value represents " 'the sum which a spouse will take at the present time in return for giving up the right to receive an unknown number of monthly checks in the future.' " 3 Family Law and Practice, supra, § 36.13 [3] [a], p. 36-73.

Calculating a pension's present value depends on several factors, including the employee spouse's life expectancy, the proper interest rate for discount and the date of retirement. See id.[24] As we observed in

---

[24] For guidance on establishing the present value of an employee spouse's interest in a vested defined contribution plan or a combination plan, see *Bloomer* v. *Bloomer*, 84 Wis. 2d 124, 267 N.W.2d 235 (1978).

*Thompson* v. *Thompson*, supra, 183 Conn. 101, "these contingencies are susceptible to reasonably accurate quantification . . . by using generally accepted actuarial principles." (Citation omitted.) See also A. Rutkin, E. Effron & K. Hogan, supra, § 27.20, pp. 423–25 (discussing calculation of present value of various types of deferred compensation plans). Once the court has determined the present value of the benefits at issue, it may, in light of relevant equitable considerations, award those benefits to the employee spouse and/or may offset the nonemployee's equitable share in the pension benefits with an award of other assets. See *Majauskas* v. *Majauskas*, supra, 61 N.Y.2d 485–86.[25]

[25] We note, with regard to the "present value/offset" method, that our statutory scheme authorizes the trial court to order the payment of alimony "in addition to or in lieu of an award pursuant to section 46b-81," and directs that, "[i]n determining whether alimony shall be awarded, and the duration and amount of the award, the court . . . shall consider . . . the award, if any, which the court may make pursuant to section 46b-81." General Statutes § 46b-82. Thus, where it is equitable to do so, the trial court may offset the allocation to one spouse of the entire value of the pension with alimony instead of or in addition to assets. It must be kept in mind, however, that awards of property and of alimony are different in quality and consequence for the recipient. Periodic alimony, unlike a property award, is subject to modification on a number of grounds. See General Statutes § 46b-86. As the amicus points out, to award alimony instead of assets, may leave the recipient spouse, often a woman, dependent on the employee spouse, without sufficient resources, and may not adequately or fairly recognize the nonemployed spouse's contribution to and expectations of security from the pension benefits. See *O'Neill* v. *O'Neill*, supra, 13 Conn. App. 300; cf. *Diffenderfer* v. *Diffenderfer*, 491 So. 2d 265, 268 (Fla. 1986); see also 3 Family Law and Practice, supra, § 37.01 [2] [a], pp. 37-12 through 37-13 ("Modern equitable distribution systems also facilitate the goal of affording a means of support for an economically dependent spouse which is not subject to the vagaries of periodic alimony and does not require continued contact between the divorced spouses. . . . [E]quitable distribution statutes also promote the finality of the parties' actual separation and parting. The goal of leaving each party in a self-sufficient state so as to preclude the need for future dealings between the parties or return trips to the courthouse, is advanced by use of property distribution instead of support payments."); H. Foster & D. Freed, "Spousal Rights in Retirement and Pension Benefits," 16 J. Fam. L. 187, 188–91 (1977–78). We need not decide in this case whether, in light of these concerns, alimony properly could be substituted for an award of property to this plaintiff.

The offset method has the advantage of effecting a "clean break" between the parties. See *Kikkert* v. *Kikkert*, supra, 177 N.J. Super. 477–78 ("Although fixing present value under such circumstances may be difficult and inexact, nevertheless immediate final resolution of the method of distribution is to be encouraged, preferably by voluntary agreement whenever possible. Long term and deferred sharing of financial interests are obviously too susceptible to continued strife and hostility, circumstances which our courts traditionally strive to avoid to the greatest extent possible."); 3 Family Law and Practice, supra, § 36.13 [3] [a], p. 36-73. It also avoids extended supervision and enforcement by the courts. See *Hunsinger* v. *Hunsinger*, 381 Pa. Super. 453, 460–61, 554 A.2d 89 (1989).

The drawback to the offset method is that it places the entire risk of forfeiture before maturity on the employee spouse. Further, this method is not feasible when there are insufficient other assets by which to offset the value of the pension; see 2 Valuation and Distribution of Marital Property (J. McCahey ed., 1991) § 23.02 [4], pp. 23-21 through 23-25; 3 Family Law and Practice, supra, § 36.13 [3] [a], pp. 36-73 through 36-77; or "where no present value can be established [by expert testimony] and the parties are unable to reach agreement" as to the value of the pension. *Kikkert* v. *Kikkert*, supra, 177 N.J. Super. 478. If there are sufficient other assets, however, several courts have favored this approach. See, e.g., *Johnson* v. *Johnson*, 131 Ariz. 38, 42, 638 P.2d 705, modified and affirmed, 131 Ariz. 47, 638 P.2d 714 (1981); *Taylor* v. *Taylor*, 329 N.W.2d 795, 798–99 (Minn. 1983); *Kuchta* v. *Kuchta*, 636 S.W.2d 663, 666 (Mo. 1982); *Kikkert* v. *Kikkert*, supra, 477–78; *Endy* v. *Endy*, 412 Pa. Super. 398, 404–405, 603 A.2d 641 (1992); *Holbrook* v. *Holbrook*, 103 Wis. 2d 327, 341–43, 309 N.W.2d 343 (1981).

The second and third recognized methods for valuing and distributing pensions involve delaying distribution until the pension matures. See *Fondi* v. *Fondi*, 802 P.2d 1264, 1266 (Nev. 1990); *Hodgins* v. *Hodgins*, 126 N.H. 711, 715, 497 A.2d 1187 (1985). Under the "present division" method, the trial court determines at the time of trial the percentage share of the pension benefits to which the nonemployee spouse is entitled. The court may then, through a QDRO for pensions covered by ERISA or some equivalent if the nonERISA plan permits, presently divide or assign the pension benefits between the spouses. See 3 Family Law and Practice, supra, § 38.04 [2], p. 38-42. In other words, the court will declare that, upon maturity, a fixed percentage of the pension be distributed to each spouse. *In re Marriage of Brown*, supra, 15 Cal. 3d 838; see *Workman* v. *Workman*, 106 N.C. App. 562, 568–69, 418 S.E.2d 269 (1992).

Alternatively, under the "reserved jurisdiction" method, the trial court reserves jurisdiction to distribute the pension until benefits have matured. Once matured, the trial court will determine the proper share to which each party is entitled and divide the benefits accordingly. *McDermott* v. *McDermott*, supra, 150 Vt. 259–60 (such a method allows a court "to base its distribution upon actual figures [as to what benefits are being paid] rather than assumptions as to retirement age and other variables"); 2 Valuation and Distribution of Marital Property, supra, § 23.02 [4], pp. 23-21 through 23-25; 3 Family Law and Practice, supra, § 37.11 [2] [b], pp. 37-163 through 37-164; see also *Whitfield* v. *Whitfield*, 222 N.J. Super. 36, 48, 535 A.2d 986 (1987) (recognizing but disapproving reserved jurisdiction approach to pension valuation and distribution).

Both the present division and the reserved jurisdiction methods have the advantage of imposing on the parties equally the risk of forfeiture, but have the cost of

prolonging the parties' entanglement with each other. 2 Valuation and Distribution of Marital Property, supra, § 23.02 [4], pp. 23-21 through 23-25; see *In re Marriage of Brown*, supra, 15 Cal. 3d 838; *Robert C.S.* v. *Barbara J.S.*, supra, 434 A.2d 388; *In re Marriage of Curfman*, 446 N.W.2d 88 (Iowa 1989). These methods are favored when there are insufficient assets to offset the award of the pension to the employee spouse alone or when the evidence is inadequate to establish present value. *Laing* v. *Laing*, 741 P.2d 649, 657–58 (Alaska 1987).

These methods are not exclusive. A trial court retains discretion to select any other method to take account of the value of a pension asset "that might better address the needs and interests of the parties." *In re Marriage of Grubb*, supra, 745 P.2d 666. The touchstone of valuation, as well as the ultimate distribution of pension benefits, is the court's "power to act equitably." *Pasquariello* v. *Pasquariello*, 168 Conn. 579, 585, 362 A.2d 835 (1975). We note that, although not expressly required by statute, a trial court, when utilizing a method to ascertain the value of a pension, should reach that value on the record. "Casting the judgment in specific amounts will make the result more comprehensible for the litigants and will facilitate appellate review as often as such review may become necessary." *Grishman* v. *Grishman*, 407 A.2d 9, 12 (Me. 1979).

## II

The plaintiff argues that although the trial court acknowledged that the defendant's pension was "an asset of the marriage," the trial court improperly valued the pension by assigning to it no value in the distribution of property. The defendant argues that a trial court may assign a pension no value if the pension is taken into account as a source of alimony.[26] We agree with the plaintiff.

---

[26] We reject the defendant's contention that to consider vested benefits for purposes of equitable distribution and also, as allocated, as a source

Our scope of review "of a trial court's exercise of its broad discretion in domestic relations cases is limited to the questions of whether the [trial] court correctly applied the law and could reasonably have concluded as it did." (Internal quotation marks omitted.) *Leo* v. *Leo*, 197 Conn. 1, 4, 495 A.2d 704 (1985); see *Rostain* v. *Rostain*, 213 Conn. 686, 693, 569 A.2d 1126 (1990). "In determining whether the trial court could reasonably conclude as it did on the evidence before it, every reasonable presumption should be given in favor of the correctness of its action. *Gallo* v. *Gallo*, 184 Conn. 36, 44, 440 A.2d 782 (1981); *Pasquariello* v. *Pasquariello*, [supra, 168 Conn. 584]." *Leo* v. *Leo*, supra, 4–5.

Our review of the record and the trial court's financial awards, although hampered by the lack of findings as to the value of any of the parties' property, confirms that the trial court failed to consider the defendant's pension interest as an asset because it did not have a "cash-in" or liquid value. In response to the plaintiff's requests for an express valuation of the pension asset, the trial court repeatedly emphasized that present value was unacceptable in light of the nonliquid nature of the asset.[27] The court offered no substitute valuation

of alimony constitutes impermissible "double dipping." Our alimony statute expressly provides that "[i]n determining whether alimony shall be awarded, and the duration and amount of the award, the court . . . shall consider . . . the award, if any, which the court may make pursuant to section 46b-81." General Statutes § 46b-82. Relying on the pension benefits allocated to the employee spouse under § 46b-81 as a source of alimony would be improper only to the extent that any portion of the pension assigned to the nonemployee spouse was counted in determining the employee spouse's resources for purposes of alimony. See *Majauskas* v. *Majauskas*, supra, 61 N.Y.2d 492–93.

[27] For example, at the February 9, 1992 hearing on the same motion, the trial court noted:

"The Court: No, I don't think the court said the pension wasn't an asset. The court said that Mr. Krafick could not go to the New York state pension people and say—the pension which is generating about—which will generate—What was it, $36,000 a year? . . .

"The pension, which will generate $36,000 a year, is not available for Mr. Krafick's withdrawal of any principal. *And so that, although it is an asset*

method. Although, as we have stated, the trial court possesses considerable discretion in selecting a method by which to take account of the value of vested pension benefits in making a property distribution pursuant to § 46b-81, or an award of alimony pursuant to § 46b-82; see footnote 25; it constitutes an abuse of that discretion to reject present value or any value for vested pension benefits merely because the asset is non-liquid, thereby effectively removing this property interest from the scales in determining an equitable division of all of the property before the court. See *Cole* v. *Cole*, 561 A.2d 1018, 1020–21 (Me. 1989). To hold otherwise would defeat the purpose of the equitable distribution statute, by permitting the trial court to treat such benefits as a mere expectancy rather than property. "The issues involving financial orders are entirely interwoven. The rendering of a judgment in a complicated dissolution case is a carefully crafted mosaic, each element of which may be dependent on the other." (Internal quotation marks omitted.) *Sunbury* v. *Sunbury*, 210 Conn. 170, 175, 553 A.2d 612 (1989).

This case, therefore, must be remanded to the trial court to assign an appropriate valuation to the pension benefits in light of the principles discussed in this opinion, and thereafter reconsider its financial orders, as necessary, so as to effectuate an appropriate distribution of the marital assets and to render appropriate orders of financial support.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to remand the case to the trial court for a new hearing

---

*of the marriage and of the relationship, it doesn't allow withdrawal by any party.* That the only thing that the husband or the wife who is going to get it, get some income from that asset, can get—*it's income. And that was a factor involved, that although it had an actuarial value of $400,000 or something of that nature, that in truth there wasn't ten cents available for the use of the parties out of principal.*" (Emphasis added.)

and determination regarding the financial aspects of the judgment of dissolution.

In this opinion the other justices concurred.