MARY V. CUNNINGHAM *v.* GERARD J. CUNNINGHAM
(AC 33403)

Gruendel, Bear and Flynn, Js.

Argued November 13, 2012—officially released February 12, 2013

*Kenneth J. Bartschi*, with whom were *Wesley W. Horton* and *Joseph T. O'Connor*, for the appellant (plaintiff).

*Thomas M. Shanley*, for the appellee (defendant).

*Opinion*

BEAR, J. The plaintiff, Mary V. Cunningham, appeals from the judgment of the trial court setting forth its

financial orders incident to the dissolution of the marriage of the plaintiff and the defendant, Gerard J. Cunningham. On appeal, the plaintiff claims that the court (1) abused its discretion in the manner in which it divided the defendant's nonqualified, nonfunded retirement plan (nonqualified plan) and that the division is unworkable and (2) abused its discretion in crafting its alimony award. We affirm the judgment of the trial court.

The following facts are necessary to our determination of the issues presented. On March 9, 2011, the court rendered a judgment of dissolution, terminating the nearly twenty-two year marriage of the parties. The court, inter alia, also entered extensive financial orders, certain of which, the court later clarified in an articulation. The court, in part, ordered the defendant to pay to the plaintiff $20,000 per month in alimony until January 31, 2018, or until either party dies or the plaintiff remarries or enters into a civil union. The court ordered that alimony was nonmodifiable as to term and that the amount of alimony also was nonmodifiable by the defendant if the sole basis for a modification is that the annual gross earnings of the plaintiff are $36,000 or less. The court also ordered in relevant part that the defendant's nonqualified plan, which is provided to him through his employer, Deloitte Consulting, LLC (Deloitte), "be divided by means of a [d]omestic [r]elations [o]rder . . . 50 [percent] to the [defendant] and 50 [percent] to the [plaintiff]." The court further ordered: "Unless the parties shall otherwise agree, the [defendant] shall elect a 50 [percent] joint and survivor annuity, so-called, and in the event that the [defendant] shall predecease the [plaintiff] prior to drawing his pension, the [plaintiff] shall be entitled to 100 [percent] of that portion of the preretirement benefit vested and accrued as of [March 9, 2011]. Any benefit vesting and accruing thereafter shall belong to the [defendant]. The

foregoing notwithstanding, it is the intention of the court that for purposes of calculating the coverture period for either the retirement or preretirement benefit, that the numerator of the fraction shall be equal to the length of time in whole months, beginning with the first day of the month in which the parties were married and ending with the last day of the month in which the marriage was dissolved, and that the denominator shall be equal to the length of time in whole months, beginning with the first day of the month in which the [defendant] commenced employment with Deloitte and ending with the last day of the month in which the marriage was dissolved. The [plaintiff] and her attorney shall be entitled to any and all information regarding the [nonqualified plan] necessary for a review of the [domestic relations order]. The court shall retain jurisdiction to deal with any issues which may arise with regard to the preparation and filing of the [domestic relations order] and the division of the [nonqualified plan]." The court also noted that "[n]either party offered any evidence as to the present value of this retirement benefit, however, each has offered a proposed distribution of this marital asset, if, as and when it is paid." This appeal followed.

I

The plaintiff claims that the court abused its discretion in the manner in which it divided the defendant's nonqualified plan and that the division is unworkable under the facts of this case. She argues: "The court's attempt to divide the [nonqualified plan] as of the date of dissolution suffers from a fundamental flaw in that it is unworkable under the facts of this case to calculate what the [d]efendant would have received from that asset had he retired on the date of dissolution. To the extent that the court reserved jurisdiction to address the issue later, that method—the reserved jurisdiction method of distribution—was expressly rejected by the

Supreme Court in *Bender* v. *Bender*, 258 Conn. 733, 761, [785 A.2d 197] (2001). More important, such calculation would result in a hypothetical figure that bears no relation to the benefits the [d]efendant ultimately receives. This error requires a new trial on all financial orders." The defendant argues that the court properly exercised its discretion when it divided the nonqualified plan. Specifically, he argues that the plaintiff has voiced no concern over the proportion of the nonqualified plan that she was awarded, but, rather, she complains about the manner of distribution of this asset. He further argues that the court's order is not unworkable or in contravention of *Bender*, and that the plaintiff "is obviously confusing the court's reservation of jurisdiction to enforce and effectuate its order, which it did, with a reservation of jurisdiction to divide the pension, which it did not. . . . Thus, contrary to the [plaintiff's] position that the division is 'unworkable,' the division is quite workable, because it provides that if, as, and when the [defendant] retires or otherwise begins to receive the benefits from the [nonqualified plan], a coverture fraction shall be applied to the entire benefit that was vested as of the date of dissolution to determine the 'marital portion.' " We agree with the defendant.

"The standard of review in family matters is well settled. An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . [T]o conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did." (Internal quotation marks omitted.) *Ranfone* v. *Ranfone*, 103 Conn. App.

243, 246, 928 A.2d 575, cert. denied, 284 Conn. 940, 937 A.2d 698 (2007).

"As a general framework, [t]here are three stages of analysis regarding the equitable distribution of each resource: first, whether the resource is property within [General Statutes] § 46b-81 to be equitably distributed (classification); second, what is the appropriate method for determining the value of the property (valuation); and third, what is the most equitable distribution of the property between the parties (distribution)." (Internal quotation marks omitted.) *Bender* v. *Bender*, supra, 258 Conn. 740. Here, the parties agree that the nonqualified plan properly was classified as property. The plaintiff also does not challenge the portion of the nonqualified plan that the court awarded to her. Rather, her dispute is with the court's valuation of the nonqualified plan, which she claims is unworkable because the court reserved jurisdiction to order the distribution and the calculation of the distribution would result in an improper hypothetical figure. We disagree.

In *Bender*, our Supreme Court explained some of the methods for valuing pension benefits for purposes of equitable distribution: "There are three general approaches to address the problems of valuation and distribution of pension benefits: (1) the present value method, also called the immediate offset method; (2) the present division method of deferred distribution; and (3) the reserved jurisdiction method of deferred distribution." Id., 754. "[T]he present value or immediate offset approach requires the court to determine the present value of the pension benefits, decide the portion to which the nonemployee spouse is entitled, and award other property to the nonemployee spouse as an offset to the pension benefits to which he or she is otherwise entitled." (Internal quotation marks omitted.) Id., 754–55. "Under the present division method [of deferred distribution], the trial court determines at the time of

trial, the percentage share of the pension benefits to which the nonemployee spouse is entitled. . . . In other words, the court will declare that, upon maturity, a fixed percentage of the pension be distributed to each spouse." (Internal quotation marks omitted.) Id., 758. "Alternatively, under the reserved jurisdiction method, [which is a variant of the present division method of deferred distribution] the trial court reserves jurisdiction to distribute the pension until benefits have matured. Once matured, the trial court will determine the proper share to which each party is entitled and divide the benefits accordingly." (Internal quotation marks omitted.) Id.

After having explained each of these methods, which are not exclusive, our Supreme Court then expressly rejected the reserved jurisdiction method, explaining: "On its face, the statutory scheme regarding financial orders appurtenant to dissolution proceedings prohibits the retention of jurisdiction over orders regarding lump sum alimony or the division of the marital estate." (Internal quotation marks omitted.) Id., 761. In the present case, it is this specific rejection of the reserved jurisdiction method of valuation by our Supreme Court in *Bender* that the plaintiff claims the trial court improperly ignored. We conclude, however, that the court in this case properly employed the present division method of deferred distribution, rather than the reserved jurisdiction method rejected in *Bender*.

In *Bender*, the plaintiff wife was awarded 50 percent of the defendant husband's unvested pension benefits earned through the date of the dissolution decree. Id., 738. The defendant claimed on appeal that the court improperly awarded unvested pension benefits to the plaintiff, for which a present value could not be determined. Id., 739. In considering the defendant's appeal, our Supreme Court explained that "[a]t the time of trial, the defendant had been employed as a firefighter by

the city of Meriden for approximately nineteen years. The defendant is entitled to a pension as a firefighter in the event that he reaches twenty-five years of service. His pension, therefore, is unvested,[1] except for purposes of disability. If the defendant were to leave the fire department before twenty-five years of service, other than for a disability, he would receive only his contributions made to the pension, which, at the time of trial, were valued at approximately $27,741." Id., 736–37. The court went on to explain that "it is, of course, theoretically possible that the defendant's pension will not vest, whether because of the defendant's resignation, misconduct on his part that results in his dismissal, the defendant's death, or a decision on the part of the municipality to discontinue the pension plan. We conclude, however, that the defendant's expectation in his pension plan, as a practical matter, is sufficiently concrete, reasonable and justifiable as to constitute a presently existing property interest for equitable distribution purposes." Id., 749.

Our Supreme Court next determined that the fact that a present value for the pension distribution could

---

[1] "By vested we refer to pension interests in which an employee has an irrevocable . . . right, in the future, to receive his or her account balance (under a defined contribution plan), or his or her accrued benefit (under a defined benefit plan), regardless of whether the employment relationship continues. 3 Family Law and Practice (A. Rutkin ed., 1995) § 36.13 [2], p. 36-71; see id., § 37.11 [1] [b], pp. 37-157 through 37-159; see also 2 Valuation and Distribution of Marital Property (J. McCahey ed., 1991) § 23.02 [2] [a], p. 23-8; see *Thompson* v. *Thompson*, 183 Conn. 96, 100 n.3, 438 A.2d 839 (1981) ([v]ested benefits . . . refer to those accrued benefits to which the employee has a nonforfeitable right to receive at retirement age whether or not he is in the service of the employer at that time). Prior to vesting, an employee's accrued benefits may be forfeited by termination of employment. Once the employee with a vested pension interest reaches the age of retirement and elects to retire, his rights are said to be vested and matured. See 3 Family Law and Practice, supra, § 36.13 [2], p. 36-71, and § 37.11 [1] [b], p. 37-159; see also *Majauskas* v. *Majauskas*, 61 N.Y.2d 481, 491, 463 N.E.2d 15, 474 N.Y.S.2d 699 (1984). *Krafick* v. *Krafick*, 234 Conn. 783, 788–89 n.12, 663 A.2d 365 (1995)." (Internal quotation marks omitted.) *Bender* v. *Bender*, supra, 258 Conn. 737 n.2.

not be ascertained did not impede the trial court's ability to award the plaintiff a percentage of the pension. Id., 762. The court explained that because the trial court had applied the present division method of deferred distribution, it was "unnecessary for the trial court to determine the benefits' present value . . . ." Id. The court held that "the trial court properly applied the present division method of deferred distribution, delaying distribution, in accordance with the domestic relations order, until the pension came into pay status. Specifically, the trial court determined, at the time of dissolution, the percentage of the benefits to which the plaintiff would be entitled in the event that the pension vested, namely, 50 percent of the pension benefits earned through the date of the dissolution decree. . . . Accordingly, the trial court did not abuse its discretion in its treatment of the defendant's unvested pension benefits." Id., 763–64.

In the present case, the court ordered in relevant part that the defendant's nonqualified plan, "be divided by means of a [d]omestic [r]elations [o]rder . . . 50 [percent] to the [defendant] and 50 [percent] to the [plaintiff]." The court also fully explained the method for calculating the coverture fraction: "[I]t is the intention of the court that for purposes of calculating the coverture period for either the retirement or preretirement benefit, that the numerator of the fraction shall be equal to the length of time in whole months, beginning with the first day of the month in which the parties were married and ending with the last day of the month in which the marriage was dissolved, and that the denominator shall be equal to the length of time in whole months, beginning with the first day of the month in which the [defendant] commenced employment with Deloitte and ending with the last day of the month in which the marriage was dissolved."

The parties do not dispute that pursuant to the coverture fraction formula, the plaintiff will receive 41 percent of the defendant's nonqualified plan valued as of the date of dissolution of the marriage. The fraction is calculated as follows: The plaintiff was awarded 50 percent of the nonqualified plan subject to the coverture fraction. On the date of dissolution, the defendant had been employed by Deloitte for 322 months, and he was married to the plaintiff for 263 months of those 322 months. Therefore, 263 divided by 322 equals approximately 82 percent. That 82 percent is then multiplied by the plaintiff's 50 percent award to get the actual award after the application of the coverture fraction. Eighty-two percent of 50 percent equals 41 percent.

Although the plaintiff argues that it would be unworkable to calculate the value of the defendant's nonqualified plan on the date of dissolution to award 41 percent of that value to the plaintiff after the defendant retires, the defendant argues that the court used the date of dissolution to determine the coverture fraction and that the plaintiff's portion of his nonqualified plan is 50 percent of whatever the defendant would have received from the plan if he had retired on the date of the dissolution judgment, "adjusted by (1) the coverture formula that we all agree is 263 [divided by] 322 months (which represents the calculation of the court's coverture order) hence 41 [percent], (2) any reductions to the benefit applied by Deloitte as required in the [nonqualified] plan (because [the plaintiff] shares in what [the defendant] receives) and (3) federal and state taxes in the event that the [defendant] incurs any such tax on the portion distributed to the [plaintiff]."[2]

---

[2] The plaintiff disputes that under the court's order her portion of the nonqualified plan will be adjusted by any reductions to the benefit applied by Deloitte. Because at this time whether Deloitte will reduce the benefit in accordance with the terms of the nonqualified plan is unknown, we offer no opinion on this potential issue.

Because the plan was nonqualified and nonfunded, the date of the defendant's retirement was uncertain, and the amount of and basis for calculation of any distribution was unknown as of the date of the dissolution of marriage, the court and the parties as of the date of the dissolution could not use the formula propounded by the court to determine the exact amount of the plaintiff's share of the nonqualified plan. That lack of information and consequent inability to determine the exact amount of the plaintiff's share as of the date of dissolution, however, did not render that portion of the court's order unworkable. The court, having determined the formula for the division of the assets received by the defendant pursuant to the nonqualified plan, had discretion to retain jurisdiction to effectuate its judgment by "deal[ing] with any issues which may arise with regard to the preparation and filing of the [domestic relations order] and the division of the [nonqualified plan]." Accordingly, we conclude that the court did not abuse its discretion either in the manner in which it divided the defendant's nonqualified plan, or in the manner in which it retained jurisdiction.

## II

The plaintiff next claims that the court abused its discretion in crafting its alimony award. She argues: "Because the trial court indicated that alimony was interrelated with the pension benefits, and because the record does not support time limited alimony for rehabilitative purposes, the termination of alimony prior to the defendant reaching the mandatory retirement age is not logically related to the facts on this record." We disagree.

" '[I]n dissolution proceedings, the court must fashion its financial orders in accordance with the criteria set forth in General Statutes §§ 46b-81 (division of marital property), 46b-82 (alimony) and 46b-84 (child support). All three statutory provisions require consideration of

the parties' amount and sources of income in determining the appropriate division of property and size of any child support or alimony award.' . . . *Rozsa* v. *Rozsa*, 117 Conn. App. 1, 5, 977 A.2d 722 (2009). [Section] 46b-82 provides in relevant part: 'In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall hear the witnesses, if any, of each party, except as provided in subsection (a) of section 46b-51, shall consider the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81. . . .' '[Section] 46b-82 describes circumstances under which a court may award alimony. The court is to consider these factors in making an award of alimony, but it need not give each factor equal weight. . . . As long as the trial court considers all of these statutory criteria, it may exercise broad discretion in awarding alimony.' . . . *McMellon* v. *McMellon*, 116 Conn. App. 393, 397, 976 A.2d 1, cert. denied, 293 Conn. 926, 980 A.2d 911 (2009). We note also that '[t]he trial court may place varying degrees of importance on each criterion according to the factual circumstances of each case.' *Ippolito* v. *Ippolito*, 28 Conn. App. 745, 751, 612 A.2d 131, cert. denied, 224 Conn. 905, 615 A.2d 1047 (1992). 'There is no additional requirement that the court specifically state how it weighed the statutory criteria or explain in detail the importance assigned to each statutory factor.' *Rivnak* v. *Rivnak*, 99 Conn. App. 326, 331, 913 A.2d 1096 (2007)." *Kaczynski* v. *Kaczynski*, 124 Conn. App. 204, 210–11, 3 A.3d 1034 (2010).

The plaintiff argues that "it appears from the limited explanation the court gave that it intended the payments from the defendant's Deloitte pensions to provide a means of support for the plaintiff when alimony ends.

The problem is that the termination of alimony is not logically aligned with the facts in the record. Alimony terminates in January, 2018. The defendant turns [sixty-two] in October, 2017. Although the defendant is required to retire by the end of the fiscal year in which he turns [sixty-two], he testified that Deloitte's fiscal year typically ends around the end of May or beginning of June. Thus, if the defendant chooses to work until he is required to retire, there will be a gap of [four or five] months from the end of alimony [to] the beginning of the pension payments. The gap amounts to $80,000 to $100,000 of support the plaintiff will not receive." The plaintiff claims that this gap creates a logical inconsistency that amounts to an abuse of discretion that requires reversal of the court's judgment on the financial orders. We understand the plaintiff's argument that the purpose of the court's alimony award was to provide support to the plaintiff until the defendant reached retirement age and that the alimony award and the award of the multiple pension benefits should provide the plaintiff with a continuous stream of income. We disagree, however, that the possible gap identified by the plaintiff between the time that the alimony ceases and the pension benefits begin creates a logical inconsistency in the judgment.

The court specifically stated that it had considered all of the statutory factors set forth in § 46b-82, "including the age, health, education, earnings, and work experience of the [plaintiff], as well as the division of assets, in light of the facts and circumstances of this case . . . ." The court proceeded to order the defendant to pay to the plaintiff the sum of $20,000 per month as periodic alimony until January 31, 2018. The court also awarded the plaintiff certain real estate, including income producing property, and personal property, including investment accounts, savings accounts and checking accounts. The court also divided all of the

parties' retirement accounts and the defendant's profit sharing plan, with the plaintiff receiving a considerable share of these accounts, including the sole possession of her own retirement accounts. When asked by the plaintiff to reconsider, inter alia, the possible gap in the alimony award, the court stated that it had "considered all of the statutory factors . . . in particular the assignment of income producing property" and it denied the plaintiff's request to reconsider this award.

After reviewing the record, we are not persuaded that the court abused its discretion in this regard. Although it is possible that the plaintiff's alimony will cease four or five months before she is eligible to receive her portion of the defendant's retirement accounts, it also is possible that the defendant will retire prior to his mandatory retirement date and that the plaintiff, in this event, will receive both alimony and her portion of the defendant's retirement accounts. Furthermore, there is nothing in the record to demonstrate that the plaintiff would be destitute or unable to care for herself during this gap, especially in light of the court's award of income producing property, which the court specifically stated it placed much emphasis on in determining the periodic alimony award. Accordingly, we are not persuaded that the court abused its discretion.

The judgment is affirmed.

In this opinion the other judges concurred.