[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The parties were married in New York City on October 24, 1980. They have one child, a daughter, Michelle born November 3, 1989. By agreement and stipulation of the parties prior to the start of trial, the court limited the hearing to testimony with regard to the financial aspects of the case. Custody and visitation were referred to Family Relations Office for an evaluation and report. The minor child currently resides with the defendant wife ("wife") at the marital home located at 60 Compo Mill Cove in Westport, Connecticut. In spite of the limitation with regard to the scope of issues, the trial took place over a period of eight days.
The wife is 45 years old. She suffers from asthma for which she takes some medications and inhalation therapy. Otherwise, she indicated that her health was good. She studied for two years at Albany University and worked as an account executive for Clinique Labs in New York. Her salary was $30,000 per year together with bonuses and commissions. Sometime CT Page 5895 prior to the marriage she resigned that position to work with the plaintiff husband ("husband") in his occupation — the operation of parking lots and garages. At the time of the hearing she indicated that she had brought some funds to the marriage, however, she did not introduce any credible evidence of specific dollar amounts.
The plaintiff husband is 58 years old. His health is apparently very good. He had two years of post high school education at Brooklyn College and six years in the military as an enlisted man. He was involved in the parking garage business for sometime prior to when the parties met and married.
The operation of parking garages and lots together with the related lease transactions can be quite profitable, and from what the court could glean from the testimony of the parties, it is a business that has as many layers as an onion, in addition to the obvious paper trail of leases, options, mortgages and other publicly recorded documents. According to the husband, there are relatively few major players in the industry, well known to each other and with whom informal dealings are fairly frequent and from whom reciprocity is expected. Significantly, in general, the leaseholds are relatively difficult to value and can be generally obtained for relatively little money down. No credible evidence was introduced regarding the fair market value of the leasehold interests held by the parties. The money to be made is in the cash flow associated with the operation of the garages and lots themselves. According to the husband's testimony, he has been at one time or another involved with approximately two dozen leases. In addition to the leasehold interests themselves, there are various corporate entities, the most important of which is the management company to which the individual lease operating companies are subordinate. It is into this Byzantime world that the parties entered, first the husband, and later the wife. Throughout most of the marriage, while the wife played an active role, the husband played the principal role in the obtaining and the management of these various business entities. According to the wife, she was not even aware of the fact that stock in the various corporations had been placed in her name. In addition, some of the leasehold interests were not wholly owned by the parties themselves but rather were shared interests with others.
Sometime prior to February of 1984 the husband established a foreign corporation by the name of Hamniermill Business Corporation, Inc., under the laws of Panama having its principal place of business in Geneva, Switzerland, the purpose of which was to purchase the real estate at 60 Compo Mill Cove in Westport and to keep any present and potential creditors of the husband at bay. The wife was made a 100% stock holder. The wife testified that it was the husband's idea, and that she concurred in the decision. From February 1984 until the fall of 1986, the parties CT Page 5896 spent more than $250,000 in renovating the property. The funds for the renovation came from their family income.
In March of 1997 as the marriage started to come unraveled, the wife arranged for the transfer of the Compo Mill property to her sole name. There is a dispute as to whether or not the husband had foreknowledge and consented to the transfer. The court heard from various witnesses and finds that the husband in fact had some knowledge of the pending transfer, but that he did not concede to said transfer which ultimately took place. At the time of the transfer, the wife immediately obtained a mortgage in her name in the amount of $800,000 the proceeds from which were placed in an escrow account with Allan Spirer a Westport attorney. The following day, a $10,000 check was drawn from the escrow account and paid to the law firm of Schoomaker and George as a retainer for legal services to commence divorce proceedings. Other disbursements from the escrow account took place over a period of time and were made almost exclusively for the benefit of the wife. Later, in December of 1997, the wife turned around and again refinanced the mortgage for $1,000,000, and the difference between the old mortgage and the new mortgage, amounting to approximately $200,000, was deposited into her personal checking account for which the husband had no access.
The court notes that a previous court held the wife in contempt for her failure to account for the proceeds for the million-dollar mortgage, and as part of that contempt provided the husband with a sum of $10,000 for an investigation into the wife's use of business funds and mortgage proceeds. According to the accounting introduced by the wife at the time of trial, from March 1997, when the house was transferred to her name, and September 2000, shortly before the trial, the wife had total cash inflows of over $1,700,000 out of which she spent $1,400,000 for her own living expenses and legal fees, and the rest in connection with the business. These expenditures included $56,912.00 for clothing, $43,035.00 for furniture, $39,005.00 for vacations, $405,000.00 in mortgage payments, and $256,874.00 in personal attorneys fees. Also, while she was living in the house, the wife used some of the mortgage proceeds to make mortgage payments in advance of their normal schedule, again, in an effort to further deplete family assets prior to trial. In addition to the foregoing disbursements, there was evidence that many thousands of dollars were spent for her "legal and accounting fees, "outside of the matrimonial action for which no credible itemized evidence of services performed was ever produced. The court finds this to be very suspicious, and it raises questions as to whether or not some of the mortgage proceeds have, in fact, been fairly or accurately accounted for.
Testimony was offered by a Westport broker regarding the wife's repeated listings of the property for far in excess of the obvious fair CT Page 5897 market value. According to her testimony, the property has limitations not the least of which is that access to it is over a private way and that the car cannot be driven to the house but must be parked some distance away. The court believes that the wife's repeated efforts to list the property for far in excess of the fair market value were part of an ill-disguised effort to remain in the house during the pendency of the present action and have resulted in further depletion of the marital assets. The court finds that fair market value of the property to be $1,900,000, based upon the stipulation of the parties.
In May 1997, the wife obtained an ex-parte restraining order which was served upon the husband late one evening, and he was given 15 minutes to gather his things and leave the house. He has not been back in the house from that day to this.
In August 1997, the wife consummated her take over of the family business, CPM Services, Inc. In short, she hired a firm called Swat Security who, armed with weapons and an order from a New York Court, barred the husband from the business and seized all of its books and records. The wife offered elaborate testimony through one of her lawyers, Stephen Shea, who said that she took this course of action as a result of some concerns she had regarding the husband's handling of the business, including some vague reference to the possibility of a parking lot deal in Russia, as well as an allegation of the husband's having said that he maintained "two sets of books." As to the latter, Attorney Shea indicated that the husband told him that there were two sets of books and that "he did [Shea] not want to know about it." The husband vehemently denies ever having said that to Attorney Shea or that two sets of books were maintained. This court found that Attorney Shea's testimony appeared rehearsed and somewhat lacking in credibility. In particular, as it came out in cross examination, the wife herself had, in fact, used the same corporate books to file the 1997 tax returns for the various business entities, which she conceded she could not have done without proper books and records. The result of the wife's actions has been to effectively shut the husband out of the only means he has known to earn a living. Currently, as a "stopgap" the husband has taken a position with the business office of an IBEW local for $600 per week. The wife has indicated that she no longer wishes to return to the parking garage business; on the other hand the husband indicates that he would like to get back into the business.
Throughout the marriage, the parties were involved in one way or another with at least a dozen leases or business entities. Currently, the umbrella organization is CPM Services, Inc. ("CPM") of which the wife is president and through which she manages the subsidiary companies/parking garages. The wife owns 100% of the stock in CPM Services, Inc. She in CT Page 5898 turn has hired other entities to manage some of the day to day operations. At the time of trial, two of the subsidiaries, DLS Management Corporation ("DLS") and 245 Operating Corporation ("245") had been placed by the wife in voluntary bankruptcy in the Southern District of New York. The wife is president of both. There was extensive testimony with regard to an option or a right of first refusal held by Glen McCarthy to repurchase these leases pursuant to agreements dating from 1993 and 1994, and, in fact, there was a lawsuit pending and arising out of the failure of the wife to honor the options. The court notes that the principal creditor in both bankruptcies is the wife herself. Other assets include Ten Commerce Corporation ("Ten Commerce"), 164 Operating Corporation ("164"), Perry Payroll ("Perry"), Vehicle Management Consultants, Inc., 404 Operating Corporation, Century Holding Corporation, and 349 Operating Corporation, all New York or New Jersey corporations. The wife is president of each. She testified that she is a 65% owner of 10 Commerce Corporation, a New Jersey parking garage, but that it has no current value. She further testified that she received $85,000 pursuant to a New Jersey court order in July of 2000 and, during the pendency of this trial, obtained another $3300 which she deposited in her checking account and never discussed with the husband. 164 Operating Corporation filed a voluntary petition which is still pending. When asked if she was creditor, the wife said she did not recall, however, the evidence is clear that in fact she is a creditor.
A significant asset is a promissory note which the husband negotiated four years ago and referred to as the ATC Operating Corporation ("ATC") note. It is an instrument on which interest only is payable currently to ATC with a balloon payment at the end of the term. The original principal amount was $2,500,000. The wife is a 34.5% stockholder in ATC, from which she derives more than $6000 per month. In addition, she receives more than $4000 per month from Kinney System, Inc. ("Kinney") pursuant to a consulting contract, a twenty-five year deal with nearly twenty more years to run. Complicating everything is a series of lawsuits involving the garages and the leases as well as various court orders in the State of New York which were obtained by the wife.
It is apparent to the court that this marriage was under some strain prior to the events of March through August 1997. The wife indicated that the husband spent too much of his free time on his boat at the Cedar Point Yacht Club, and that she felt lonely. There was conflicting testimony with regard to a serious apartment fire in 1991 where its contents were destroyed. The wife indicated that she and her daughter were both in the apartment and was understandably quite upset. She says she alone conducted the clean up. The husband through his direct testimony countered that, and indicated that he came to the apartment on a regular basis following work to help sorting through the debris. The CT Page 5899 wife also testified with regard a medical problem that their daughter, then 18 months old, had in 1991. She indicated that she bore the burden for the child's care and recuperation. The husband disputes this. The wife clearly felt that the husband was more at fault in the breakdown and that her contribution to the breakdown was the fact that she was "critical of him." She indicated that in January 1992, she tried to discuss serious problems with him (1991 being a tough year with the fire and their child's illness), and she suggested marriage counseling. The wife thought it would be helpful, but she said she would get basically "no response" from the husband. Later on in 1996, the wife became pregnant again, as she described it "unexpectedly," and she indicated that her husband's response was emphatically and vehemently negative. She indicated that she made a decision to terminate that pregnancy. She indicated that she became so emotionally upset by his response, that she obtained counseling and took anti-anxiety drugs for a long time afterward. She indicated that the husband told her he wanted a "financial separation and not a divorce."
The court makes the time-honored observation that there are usually two sides to every story and the truth lies somewhere in the middle. In this particular instance, based upon the eight days of testimony and the court's opportunity to observe the demeanor of both parties and their witnesses, while the court places a halo over neither party, it has found the husband to be a more credible witness than the wife. Accordingly, the court has discounted much of her version of events. Unlike even the most intrepid modern day high wire artist, given the dispersion of extended families, married couples today are expected to "work without a net." However, in addition to love, the core elements of a good marriage in any era are mutual respect, trust, and loyalty. Where, as here, any or all of these are lacking, the results are usually devastating, in particular, for the minor child. This court is reminded of a Confederate cavalry officer, who when asked the secret of his success, replied laconically that, "I got there first with the most!" Fine for war, but not for dissolution of marriage.
 FINDINGS
The Court, having heard the testimony of both parties, and having considered the evidence presented at hearing, as well as the factors enumerated in Sections 46b-56, 46b-66a, 46b-81, 46b-82, 46b-84, and46b-215a of the Connecticut General Statutes, including the Child Support and Arrearage Guidelines Regulations, hereby makes the following findings:
 1. That it has jurisdiction. CT Page 5900
 2. That the allegations of the complaint are proven and true.
 3. That the marriage of the parties has broken down irretrievably, and that ample evidence exists that both parties have contributed to said breakdown.
 4. That it is in the best interest of the minor child that the plaintiff husband play a significant role in her upbringing and development, and that he enjoy significant visitation with the child as well as input into the major decisions regarding her life, including, but not limited to her religious training, medical treatment, and educational development; and therefore, the court should continue the pendente lite orders re visitation until the completion of the Family Relations custody evaluation and report or further order of court, that it should reserve jurisdiction with regard to any such issues which may arise.
 5. That it is in the best interest of the minor child that the pendente lite award of child support continue until the completion of the Family Relations child custody evaluation and report or until further order of court; and that it should reserve jurisdiction with regard to any such issues which may arise.
 6. That neither party has requested alimony; each has a demonstrated earning capacity; and that it is equitable and appropriate that no alimony be awarded to either.
 7. That after considering all of the testimony of the parties and their witnesses, that the husband was aware of the wife's intention to accept transfer of the 60 Compo Mill Cove property from Hammermill Business Corporation, Inc., an foreign corporation established but not controlled by the husband, to her sole name, but that he was powerless to stop same and that said transfer was orchestrated by the wife as part of a comprehensive plan to advantageously position herself for the upcoming legal actions which she was contemplating at that CT Page 5901 time.
 8. That the husband established Hammermill Business Corporation, Inc., to purchase with family funds and to hold title to the marital home at 60 Compo Mill Cove, Westport, Connecticut, and in which the wife was the sole shareholder, in order to protect this asset from the husband's creditors; that the husband had a reasonable expectation that the wife would act in the best interest of both parties in her dealings therewith, in particular with regard to the real property; and that the wife's actions inter alia the transfer of title to her name, as well the subsequent mortgages and her use of the proceeds therefrom, were against equity and good conscience and gave rise to a constructive trust. Spatola v. Spatola, 4 Conn. App. 79, 81 (1985).
 9. That the fair market value of the real property located at 60 Compo Mill Cove, Westport, Connecticut, is $1,900,000 by virtue of a Stipulation of the parties dated December 5, 2000 (Def. Exhibit B); further that there is a first mortgage to Home Federal Savings Bank dated December 19, 1997, in an original principal amount of $1,000,000 as well as smaller mortgages to secure attorneys fees for both parties; and that the remaining equity is approximately $750,000.
 10. That throughout the marriage, for a variety of business and/or family purposes, the parties established and/or acquired business entities and acquired leases and other properties in which the wife was a shareholder or holder of legal title; that the husband had a reasonable expectation that the wife would act in the interest of both parties in her dealings therewith; and that the wife's actions were against equity and good conscience and gave rise to a constructive trust. Spatola v. Spatola, 4 Conn. App. 79, 81 (1985).
 11. That to the extent that any or all of the following are existing legal entities, leases or contracts, the interests of the wife in CPM Services, Inc., ATC Operating Corporation (including the promissory note and deed from CT Page 5902 Stanley Muss), Perry Payroll, Inc., Ten Commerce Operating Corporation, 164 Operating Corporation, Vehicle Management Consultants, Inc., 404 Operating Corporation, Century Holding Corporation, 349 Operating Corporation, Hammermill Business Corporations, Inc., and the Kinney System, Inc. consulting contract are all marital assets subject to equitable distribution.
 12. That based upon the testimony of the wife and the evidence presented to the court, the wife's claim as a creditor in the pending bankruptcies for unpaid salary for services rendered to DLS Management, Inc. and 245 Operating Corporation was not based upon a contract or past practice, but rather upon her "inquiry about what other executives in similar corporations were paid," and that the principal purpose of filing the voluntary petitions was to place said assets beyond the reach of the husband and of this court.[1]
 13. That the interests of the wife in DLS Management, Inc. and 245 Operating Corporation are marital property subject to equitable division, however, the voluntary petitions of each entity under Chapter 11 of the Bankruptcy Code, now pending in the U.S. Bankruptcy Court for the Southern District of New York, prevents disposition and/or division at this time; that to further delay the division of other marital assets will result in their further significant waste and erosion; and that it is equitable and appropriate for the court to reserve jurisdiction to determine the proper share of these two assets to which each party is entitled and divide any benefits therefrom accordingly. Krafick v. Krafick, 234 Conn. 783, 803 (1995).[2]
 14. That the actions of the defendant wife just prior to the separation of the parties and during the pendency of the this matter have been so driven by self interest, and were calculating, ruthless, and totally devoid of good faith toward her spouse of 21 years, the result of which is that she has inter alia either wasted and/or utilized substantial amounts of the marital assets for her CT Page 5903 sole benefit, frozen income-producing assets in two voluntary bankruptcies in which she is the principal creditor, and at the same time has effectively deprived the husband of the means to earn a livelihood at his customary occupation, for a period of nearly four years; and that for this court to countenance such actions by a party to this "unique human relationship" would fly in the face of well established legal precedents. Billington v. Billington, 220 Conn. 212, 221
(1991).
 15. That, after considering all of the testimony of the parties and their witnesses, the court finds that the wife's seizure of the books and records of CPM Management Services, Inc. and the forcible removal of the husband from the operation of said business was improper and not warranted by the facts and circumstances.
 16. That an inordinate amount of attorneys fees have been expended and/or incurred (and continue to be incurred) by the parties in the present action as well as several collateral legal actions, and that under all of the facts and circumstances, including the fact that a significant portion were incurred due solely to her actions, that the wife should bear responsibility for all of her legal fees not already covered by the mortgage on the Westport property as well as a significant portion of the husband's legal fees.
 17. That the parties have stipulated and agreed that the statement of attorneys fees and costs of Mark Henderson, Esq. as special master in the amount of $6,468.00 are fair and reasonable and should be paid by the parties as may be determined by the court.
 ORDER
IT IS HEREBY ORDERED THAT:
 1. The marriage of the parties is hereby dissolved, and they are each hereby declared to be single and unmarried. CT Page 5904
 2. The pendente lite orders regarding custody and visitation shall remain in full force and effect until the completion of the Family Relations custody evaluation and report or further order of the court, and the court hereby reserves jurisdiction as to this issue.
 3. The pendente lite child support order shall remain in remain in full force and effect until the completion of the Family Relations custody evaluation and report or until further order of the court, and the court hereby reserves jurisdiction as to this issue.
4. No alimony is awarded to either party.
 5. Pursuant to Sections 46b-66a and 46b-81 C.G.S. the court hereby orders the wife to transfer to Mark Henderson, Esq., Trustee all of her right title and interest in and to the real property at 60 Compo Mill Cove, Westport, Connecticut, by means of a fully-executed Quit Claim Deed in proper form along with completed Conveyance Tax Forms within one (1) week from the date of this Memorandum of Decision. The trustee shall list the real property for sale no later than June 1, 2001, with a mutually acceptable broker who is a member of the Multiple Listing Service or other similar organization, familiar with real estate values in the Westport area, at a listing price not to exceed $2,200,000. The trustee shall accept any bona fide offer without unusual conditions, which is within 5% of the listing price. Title shall close within ninety days from acceptance of the offer. The trustee is hereby vested with full power to perform all necessary acts regarding the maintenance and sale of the property, including any negotiation with the first mortgagee in the pending foreclosure, subject only to orders of this court and shall, be held indemnified and harmless by both parties from any and all acts in connection therewith. In addition he shall be entitled to reasonable compensation for his services based upon his customary and usual hourly rate, such compensation to be paid from the CT Page 5905 proceeds of the sale. Upon sale of the property, from the proceeds shall be paid the customary and ordinary costs associated with a sale of real estate, including broker, trustee, and attorney fees, conveyance taxes, fixup expenses, and any mortgages and liens in existence as of January 1, 2001. After the payment of these sums, the net proceeds shall be payable to the husband free and clear of any claims by the wife in order to offset, in part, the marital assets and monies wrongfully appropriated for her own use and benefit, including the mortgage for a portion of her legal fees. Until closing of title, the wife shall have the right to occupy the real estate with the minor child, and she shall during her occupancy be responsible for the payment of all mortgages, liens, taxes, and insurance, and shall indenmify and hold the husband harmless from any further liability thereunder. The wife shall be responsible for the payment of any capital gains associated with the sale of said real estate. In the event that the husband incurs liability or expense regarding said capital gains, he shall be entitled to an offset against any monies he is obligated to pay to the wife for her benefit under 6 D.2 hereof Neither party shall further encumber the property. The court reserves jurisdiction to enter appropriate orders to implement these orders, including a judicial transfer to the trustee pursuant Sections 46b-66a and 46b-81
C.G.S.
6. Personal property shall be divided as follows:
 A. The minor child's furniture shall remain in the residence of the parent with whom she principally resides.
 B. The home furnishings (other than the minor child's furniture) shall be divided as nearly equally as possible. In the event that the parties are unable to agree upon a division, the issue is hereby referred to Family Relations for resolution and recommendation. The foregoing notwithstanding, the husband shall be immediately entitled to the following CT Page 5906 personal property now in the possession and control of the wife and said transfer shall take place within one (1) week from the date hereof:
1. Black granite panther sculpture;
 2. Black wooden Shaker bench approximately 75 inches long; and
3. Gray half-moon-shaped framed glass window.
 C. Each party shall be entitled to keep the automobile which they are currently driving free and clear of any claims by the other, and each party shall cooperate with the other regarding the execution of any documentation necessary to transfer and/or register same.
 D. Leases/corporations/mortgages/contracts and similar property, wherever located, as well as any income or benefits appertaining thereto shall be divided as follows:
 1) 245 Operating Corporation and DLS Management, Inc.: The court reserves jurisdiction pending the outcome of the voluntary bankruptcies now pending in the U.S. Bankruptcy court for the Southern District of New York., to determine the proper share of these two assets to which each party is entitled and divide any benefits therefrom accordingly.
 2) CPM Services, Inc., ATC Operating Corporation, Perry Payroll, Inc., Ten Commerce Operating Corporation, 164 Operating Corporation, Vehicle Management Consultants, Inc., 404 Operating Corporation, Century Holding Corporation, 349 Operating Corporation, Hammermill Business Corporations, Inc., and the Kinney System, Inc., consulting contract: The wife shall forthwith transfer and/or assign all of her right title and interest in and to these assets, in whatever legal CT Page 5907 form or manner held by her, including but not limited to stock certificates, leases, or mortgages, together with all books and records and shall, within ninety (90) days from the date hereof, at her sole expense, account to the husband for all receipts and expenditures in connection therewith from September 1, 2000 until the date of transfer. Thereafter, the husband shall have the right to hold, manage, sell, transfer or otherwise dispose of said assets, or any interest therein, in his sole and absolute discretion, for the benefit of both parties, as follows: The net income derived therefrom (after payment of taxes and reasonable business expenses) shall be paid 75% to the husband and 25% to the wife, at least quarterly commencing July 1, 2001, for a period of ten years from the date hereof, thereafter the parties shall share the net income equally. Upon the sale or other disposition of any interest in any of the foregoing assets, the net proceeds shall be divided 75% to the husband and 25% to the wife if sold or otherwise disposed of during the first ten years from the date hereof, thereafter the parties shall share the net proceeds equally. The husband shall account to the wife on an annual basis within sixty (60) days following December 31 or the fiscal year, whichever applies with regard to income and expenses or the net proceeds of any sale or transfer. The unequal division is by way offset in part for the marital assets and monies wrongfully appropriated by the wife for her own use and benefit, as well as for the husband's skills and efforts to manage these assets for the benefit of both parties in the future. Upon the sale, transfer, dissolution, or other disposition of each of the foregoing assets, the husband shall have no further liability or obligation to the wife regarding such asset, with the exception CT Page 5908 of his duty to provide an accounting.
 7. Except as otherwise set forth herein, the parties shall each be responsible for the debts as shown on their respective financial affidavits, and they shall indemnify and hold each other harmless from any further liability thereon.
 8. The husband shall maintain and pay for health insurance for the minor child so long as he shall be obligated to pay child support. Un-reimbursed medical, dental, orthodontic, optical, pharmaceutical, psychiatric, and psychological expenses for the minor child shall be divided by the parties, 50% by the husband and 50% by the wife. The provisions of Section 46b-84 (e) shall apply.
9. Attorneys fees and costs shall be paid as follows:
 A. The wife shall be liable for her own attorneys fees over and above those covered by the existing mortgage on the Westport property and costs in connection herewith without contribution by the husband.
 B. The husband shall deduct from the net proceeds from the sale of the real estate at 60 Compo Mill Cove, Westport, Connecticut, his attorneys fees and costs incurred in connection with this action.
 C. The fees of Mark Henderson, Esq. as special master amounting to $6468 per Stipulation of the parties dated November 21, 2000, shall be paid from the net proceeds from the sale of said real property.
 10. The Court hereby orders a Contingent Wage Withholding Order pursuant to Section 52-362
C.G.S. in order to secure the payment of the child support orders.
 11. The court hereby reserves jurisdiction to enter appropriate orders to implement the foregoing orders as may be necessary and appropriate.
CT Page 5909
THE COURT
SHAY, J.