[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This decision dissolves the four-year marriage of Elizabeth and Marco Gonzalez. On December 29, 1999, the plaintiff filed this action alleging that her marriage to the defendant had broken down irretrievably. She sought sole custody of their minor child, child support, and assignment of the marital property to herself. The defendant has agreed that their child may live with the plaintiff and to pay child support, but has requested an order of joint custody, an award of alimony, and 20% of the net worth of the marital estate. With the parties disputing custody, visitation, and financial orders, the case was referred to the regional family trial docket for trial, which this court held on three days in September of this year. The parties appeared for trial, and each testified and offered documentary evidence. In addition, the court heard testimony from the court-appointed guardian ad litem (GAL), attorney Bridget Garrity; family relations counselor Dean Alexander; and two certified professional appraisers (Richard Seman, Jr., for the plaintiff, George DeVoe for the defendant). Each party also filed written claims for relief.
 I — FINDINGS OF FACT
The court has observed the demeanor of the parties and evaluated their credibility. The court has carefully considered all of the evidence, including the exhibits and the testimony presented, according to the standards required by law.[1] The court has carefully considered the statutory criteria for dissolving a marriage and entering orders regarding custody, visitation, child support, alimony, orders of life and health insurance and payment of the child's health expenditures, and the award of counsel fees. Upon such consideration, the court finds the following facts to have been proven, as well as additional facts included in later sections of this decision. CT Page 15402
The court finds that it has jurisdiction over the marriage. One party has resided in Connecticut continually for more than one year prior to the bringing of this action. The parties were married in Woodbury, Connecticut, on July 5, 1997. They resided together as husband and wife for approximately two and one-quarter years. They have one minor child, Christian Gonzalez, born issue of the marriage on August 17, 1998. No other minor children have been born to the wife since the date of the marriage. The parties have not been recipients of state assistance. The marriage between the parties has broken down irretrievably with no reasonable hope of reconciliation.
The plaintiff is thirty-seven years old and disclosed no health problems in her testimony at trial. There was no evidence as to her highest level of education. The plaintiff is employed in a fund-raising capacity at Taft School as associate director of development. She has worked there for nine years. Her current salary is approximately $69,000, and she annually gets a cost-of-living adjustment, which last year was a three per cent increase in salary. From the position she occupies, the length of time she has been so employed, and the salary she earns, the court infers that she has occupational skills in writing, interpersonal relations, and some financial matters. Her employer matches her annual pension contributions of 3% of salary with an additional 9%. Her employer also provides free life insurance of $50,000 and free health insurance for her.
The defendant is twenty-nine years old. English is not his first language. He has a GED certificate and a semester of college. He also has training as a marine mechanic and job experience in the hospitality industry. The evidence disclosed no health problems for him.
The parties met when the plaintiff, vacationing in Belize during March 1996, hired the defendant, a resident there, as a tour guide for a snorkeling expedition. During the ensuing courtship, she returned several times to Belize and they spent six months living together at her home in Woodbury, Connecticut. As the parties started considering marriage, they discussed where to live and how to support themselves. The plaintiff wanted to stay in Connecticut, where she was employed and earning more than $50,000 a year. She has always lived near her family in this state. The defendant worked in his parent's small inn and as a tour guide and earned approximately $75 a day. He had lived previously in the United States and Canada. Recognizing how important it was to the plaintiff to live in this country, the defendant agreed to move to the United States, but told her that he wanted to remain involved in his family's business.
After they were married, the parties first lived in the defendant's CT Page 15403 Woodbury home. The defendant worked as a mechanic at a marina, then for a landscaping company, and finally obtained employment at the Mayflower Inn in the Town of Washington. He contributed his earnings, in the mid-four hundred dollar per week range, to household expenses. The defendant was unhappy in his work, however. He was frustrated with how much money he was then earning. "It was an awful feeling," he explained at trial, "not to feel like you can provide." He wanted to run his own business, and the plaintiff gave him money to start several ventures, none of which were successful. The plaintiff also paid off pre-marriage credit card debt he had accumulated; She gave him $1,750 to purchase land in Belize, which the government there offered residents an opportunity to buy for less than market value. The parcel he bought was worth approximately $20,000. In total, she gave him about $8,000 for the credit card debt, his business ventures, and the land.
After a few months of marriage, the parties decided to have a child. When the plaintiff was six months pregnant, they moved to a new home at 3 Curtis Road in Washington, which the plaintiff purchased for $215,000 in May 1998 (with $5,000 in give backs by the sellers at the closing). The plaintiff obtained mortgage financing for $168,000. For the $42,000 down payment, the plaintiff's grandparents gave each party $10,000, her parents gave her $10,000, and the plaintiff contributed the balance from her savings. They did not name the defendant as a co-purchaser because he did not yet have legal resident status here. (He has since obtained a green card permitting him to live and work in the United States.)
Despite their decision to have a child and purchase a home, the parties' marriage was not trouble-free. Their communication styles were incompatible. The defendant has a strong personality and expresses his wishes and intentions forcefully. He does not readily accept opinions, decisions, or conduct of others with which he does not agree. The plaintiff, on the other hand, prefers to avoid verbal conflict and would rather say nothing than have a confrontation. At times the plaintiff became intimidated by the defendant. (There was no evidence offered, however, nor any reason to infer, that he ever threatened or physically abused her.)
During pregnancy the parties disagreed about where to have the child delivered. The plaintiff wanted to have the baby at Yale New Haven Hospital, because she believed it offers superior post-natal care. The defendant was worried that New Haven was too far from their home and that if complications arose during child birth the time they would spend driving to New Haven might jeopardize the mother or fetus, but he acceded to his wife's wishes.
After a nine-week maternity leave following Christian's birth, the CT Page 15404 plaintiff returned to work and placed the baby in daycare. She became his primary caretaker on nights and weekends. During the week, the defendant worked long hours, early in the morning until late at night, at the Mayflower Inn, where he was assuming increasing responsibilities. She would pick their son up from daycare, feed and bathe him, and put him to bed. The plaintiff was unhappy that the defendant spent time on weekends pursuing his business ventures or with his friends.
The parties soon began to disagree about the child's medical care. The plaintiff believes that the defendant does not accept American standards of medical care. He complained about the plaintiff taking Christian to a pulmonary specialist after the baby developed respiratory bronchiolitis in his first year. When Christian began having frequent ear infections, the parents consulted an ear, nose and throat (ENT) specialist, who suggested that they try a regimen of medication. Another ENT specialist later told them that prolonged use of antibiotics could damage the baby's liver function. The second specialist recommended instead surgical implantation of ear tubes. He cautioned them, however, that death was a risk of using anaesthesia during such a procedure. An alternative course, he advised, would be to remove the child from the daycare environment that was probably the source of his ear infections. The defendant, concerned about the risk of death, told the plaintiff that they should not subject the child to that hazard and that he wanted to stay home during the day to care for the child himself, rather than keeping Christian in daycare. The plaintiff disagreed, believing that they could not afford to give up the defendant's income.
In October 1999, the defendant learned from his parents in Belize that they had been offered $300,000 to sell. their inn to a developer, who planned to tear down the inn and build condominiums on the land. The defendant's parents had built their small inn many years ago on land his father had inherited. Because of increasing competition and more hotel rooms available to tourists in Belize, their inn was no longer financially successful. It needed renovating and an improved marketing campaign. The defendant did not want his parents to give up their life's work. He had always aspired to run or own the inn himself. Selling it would dash that hope. He told his wife that his family needed him and that he had to return to Belize immediately. She was shocked because she thought that he regarded Christian and her as his family. The plaintiff did not join her husband but stayed behind in Connecticut.
The defendant drove to Belize with two Connecticut friends, Hugo DeVoe and Larkin DeVoe. When they got there, he agreed with his parents to take over management of the inn for five years. The Larkin brothers and he renovated the inn. He developed and began implementing a marketing plan to attract new tourist trade. He took out a loan for approximately CT Page 15405 $13,000, secured by the Belize parcel he had bought earlier with his wife's funds, for money to pay laborers and the first six-month installment due on his lease of the inn from his parents. He found someone he trusted to run the inn upon his return to the United States. He believed that he could earn a profit from this new arrangement and begin to make more of a financial contribution to his wife and child.
While the defendant was in Belize, the plaintiff reflected on the difficulties in their marriage. She decided she could no longer tolerate what she referred to as his "male dominant . . . machismo" attitude that had led to constant power struggles between them. Then she received an email from him that scared and shocked her. In that email, the defendant recounted an incident when, as a teenager, he had told his mother that he would kill her if he did not have to go to jail as a result. The plaintiff decided to file for divorce. She also converted the marital funds in their joint checking account into an account exclusively in her name.
In an application for rule to show cause and temporary restraining order filed with the Superior Court, the plaintiff alleged that she was "apprehensive and in fear that the defendant may attempt to return to Belize with the minor child if [he] is permitted to visit the child without supervision." On an ex parte basis, the court, DiPentima, J.,
granted a temporary restraining order prohibiting the defendant from entering the marital home and restricting his contact with Christian to three one-hour visits during the week at the day care and three hours every other Saturday supervised by the plaintiff, her parents, or her sister.
When the defendant found out that the plaintiff was planning a divorce, he abandoned his efforts to oversee renovation and management of the inn. He immediately left Belize, without finishing his plans to get the inn back on sound financial footing. His brother, whom the defendant left in charge of the inn, did not manage the inn's business well. Within months, the inn was earning less income than its expenses. The defendant could not make payments on the Belize bank loan. Faced with foreclosure on the lot that secured that loan, the defendant transferred his interest in the parcel to his parents and gave up his lease to manage the inn. His return to Connecticut had forsaken his aspirations to make the inn financially viable. Yet, even as events in Belize over the following months were dashing his hopes of making the inn profitable, the defendant stayed in Connecticut to stay close to Christian and seek court orders of access and custody.
Upon the defendant's return to Connecticut, a marshal served him with the dissolution complaint and temporary restraining order on the doorstep CT Page 15406 of the marital house. The plaintiff gave him a futon and a pillow but kept all the other marital possessions. On February 7, 2000, the court entered an order by agreement of the parties that the plaintiff would have sole custody and physical residence of Christian and that the defendant would have unsupervised visitation with his son on Mondays and Tuesdays from 3:30 to 5:30 p.m. After he completed parenting classes at McCall Foundation, his parenting time increased to 6:00 p.m. both days.
Shortly after the divorce proceedings began, the defendant lost his job at the Mayflower Inn. He had been very successful there, his supervisors had thought highly of him, and he had advanced in responsibility to supervising other employees. After being accused of sexual harassment, however, he lost that position. He still wants to work in the hospitality industry, but has not yet found another job here doing so. Since losing the job at the inn, he has worked for a pool and spa company earning in the same mid-four hundred dollar a week range as for most of the marriage.
The defendant's financial affidavit claimed weekly net income of $376 and expenses of $379. It lists indebtedness of $10,125, as follows:
Creditor Total liability
Mark Rogg (loan for counsel fees) $5,000 Steven Macavin $2,300 Belize Bank $2,100 Back Rent $800 SNET $900
The defendant's affidavit lists few assets: a 1983 Chevrolet Caprice worth $500, bank accounts of $150, a 401K from the Mayflower Inn of unknown value, and tools worth $1,450. From the testimony and evidence, the court finds these amounts credible. The plaintiff's proposed financial orders also refer to a boat and trailer at-the marital home as belonging to the defendant; as there was no evidence offered at trial about either, the court cannot make a finding as to their respective values.
When the plaintiff filed this action, the defendant still owned the parcel of land he had purchased in Belize with the plaintiff's money. Although worth approximately $20,000, it was by then encumbered by the mortgage he had placed on it. From the evidence at trial, the court finds that the defendant has since relinquished his ownership interest in this property.
The plaintiff's financial affidavit lists the following assets: the marital residence at 3 Curtis Road, which at the time of trial had a CT Page 15407 mortgage indebtedness of $161,000; a 2000 Subaru Outback worth $16,000 that her parents gave her in December 2000; stocks and bonds worth $100,174; deferred compensation of $129,894; and a one-quarter interest in her parents' farm in Vermont. She shares ownership of that farm with her siblings, and the parents have transferred the ownership to their children as part of their estate planning. The court finds that the defendant did not contribute toward the accumulation of these assets except for (a) the ten thousand dollars given to him by the plaintiff's grandfather that he contributed toward down payment on the marital home, and any increase in equity attributable to that sum; and (b) an unknown amount of money that the defendant had contributed from his earnings to the joint checking account and the plaintiff converted to her own funds after bringing the divorce.
Evidence as to the value of the marital home and family farm was disputed at trial. The family farm consists of almost 400 acres in Ludlow, Vermont, with dwellings and buildings, including a house built in the 1800s, appraised as worth $302,000 by the Town of Ludlow. From the evidence heard at trial, the court finds that the farm and land are worth at least $570,000, and the plaintiff's interest therein is at least $143,000.
The parties also disputed the current value of the marital home in the Town of Washington, and each offered the testimony of a certified appraiser, George M. DeVoe for the defendant and Richard Seman, Jr., for the plaintiff. Both DeVoe and Seman had appraised the property in mid-2000 and essentially agreed as to its value then (DeVoe finding the value at $250,000 and Seman at $240,000). They dramatically disagreed about its present value, however. DeVoe testified that property values in Washington had shot up 70% in the last year because "Washington has become the place that the weekend summer New Yorker crowd wants to be." He claimed that the property is now worth $375,000. Seman acknowledged that property values in that town had increased in the last year, but said not even by as much as 20%. He testified that the property is now worth $280,000. Their appraisals this year used certain houses in common as comparables but disagreed about how to assess the effect of the comparable sales.
After reviewing the testimony of the two experts, and considering their reports, the court is not fully persuaded by either.[2] Seman's criticism of DeVoe's appraisal was not persuasive. DeVoe's critique of Seman's report was persuasive. Yet by not using the standard appraisal report form, or disclosing elsewhere in his report or testimony the specific factors and amounts for each factor he assigned to distinguish each comparable sale, DeVoe's own analysis is difficult to evaluate. From the totality of the appraisal evidence, the court concludes that the CT Page 15408 value of the marital home has increased substantially in the last year, by at least $40,000, to more than $280,000. The equity in the house has increased, at minimum, from $42,000 at the closing to at least $119,000 now.
The plaintiff's financial affidavit claimed that she has income of $1,331 gross each week, $735 net weekly, and weekly expenses of $1,142. She testified that she has not received any gifts of cash during the marriage other than $20,000 in 1997 and 1998 from her now-deceased grandfather. The income listed on her financial affidavit did not include child support, on which the defendant has an arrearage of $976. As deductions, she claims $135 weekly for "flex/medical insurance" and $106 for retirement. From other testimony at trial, the court finds that the former deduction includes her $38 weekly payment for Christian's health insurance and five thousand dollars deducted annually to pay for child care, both paid on a pre-tax basis. Yet the affidavit also lists $186 for day care as among her weekly expenses. Despite claiming more expenses than income, the plaintiff's affidavit listed her as owing only one debt, a Visa bill for one thousand dollars. Although the court finds her claim of gross earnings credible, and accepts as true the implicit claim of her financial affidavit that the amount listed for "net income" represents the weekly amount of her net pay from her employer, based on the foregoing, the court can only conclude that she has more income than she discloses or fewer expenses.
The plaintiff also testified that she is the guardian of a savings account in the amount of $345 and a Payne Webber account of approximately for $14,000 that have both been established for Christian's benefit. She provided the funds for the savings bank account, which, under Salvio v.Salvio, 186 Conn. 311, 324, 441 A.2d 190 (1982), is subject to distribution as part of the marital estate. The Payne Webber account, a gift from the plaintiff's parents under the Uniform Gifts to Minors Act, General Statutes § 45-101 et seq., is not part of the marital estate. See Weisbaum v. Weisbaum, 2 Conn. App. 270, 477 A.2d 690 (1984).
At trial the defendant praised the plaintiff's parenting style of Christian. He believes that she has provided a stable, loving environment for their son. The evidence confirms his belief. The plaintiff, on the other hand, maintained that the defendant has put Christian at risk, by, for example, letting the child eat peanuts, ride on bicycle handlebars without a helmet, stand on the roof of a car, and ride in an unsafe car. She offered no independent evidence, other than her own testimony, that any of these events had occurred; and her testimony about such alleged occurrences did not provide enough detail about when these events had occurred or the circumstances of each to be credible. The family relations counselor and guardian ad litem both testified that they do not CT Page 15409 believe the mother's concerns present a sufficient reason to restrict the defendant's access to Christian.
Now three years old, Christian is a happy child with no apparent problems. He is doing well despite the conflict between his parents. His language and developmental abilities have all progressed normally. He loves and is bonded to both his parents. He is a quick learner, has a good range of vocabulary and understanding for a child his age, and can communicate effectively with his peers, his parents, care providers, and others. Both parents are loving and appropriate toward him. Both set limits and boundaries for him appropriately. He has spent most of his time with his mother, who has provided him with a nurturing, stable and supportive home environment that has allowed him to develop normally both emotionally and physically.
From the evidence heard at trial, the court does not attribute greater fault to either party in the breakdown of the relationship. Although the plaintiff complains about the defendant's personality as causing the problems between them, the evidence at trial made clear that she knew about his personality traits and communication style before they married. The evidence also made clear that she entered the marriage knowing the defendant wanted to keep involved in the family business. His return to Belize was consistent with that desire.
The court finds that the guardian ad litem incurred a reasonable fee of $17,267.25 for professional services rendered.
 II — DISCUSSION
There are several issues to be decided here: property division, alimony, child support, custody, visitation, and payment of counsel and GAL fees. Property division, alimony, child support, and counsel fees all require analysis under the statutes that govern awards concerning them. General Statutes §§ 46b-62, 46b-81, 46b-82, and 46b-84. The court is not required to make explicit reference to the statutory criteria it has considered in making its decision or to make express findings as to each statutory factor. Caffe v. Caffe, 240 Conn. 79, 82-83
(1997).
A. Custody
In making custody and visitation orders, the court must be guided by the best interest of the minor child. General Statutes § 46b-56
(b);[3] Szczerkowski v. Karmelowicz,60 Conn. App. 429, 432, 759 A.2d 1050 (2000). "This involves weighing all the facts and circumstances of the CT Page 15410 family situation. Each case is unique." Gallo v. Gallo, 184 Conn. 36,43, 440 A.2d 782 (1981). Many factors may affect such a determination. See, e.g., Ireland v. Ireland, 246 Conn. 413, 452, 717 A.2d 676 (1998);Janik v. Janik, 61 Conn. App. 175, 180, 763 A.2d 65 (2000). It encompasses such concerns as "the child's interest in sustained growth, development, well-being, and in the continuity and stability of its environment." Capetta v. Capetta, 196 Conn. 10, 16, 490 A.2d 996 (1985). The best-interest standard is necessarily fact-specific, giving the court wide discretion to consider all the different and individualized factors that might affect a specific child's welfare and best interest.
The plaintiff seeks sole legal and physical custody of Christian, and the guardian ad litem and family relations counselor support her request, all for the same reason — the unwillingness to date of the defendant to listen to and consider the views of others. His aggressive communication style, coupled with the plaintiff's lack of assertiveness, makes it difficult for the parties to communicate effectively with each other about Christian. When asked by his attorney why he sought joint custody, the defendant responded that he believed it is important for their son to see that both parents get along with and can communicate with each other. Although he is absolutely correct that it would benefit Christian to see his parents able to interact with each other successfully and without animosity, such is not yet the case here. This goal is one to which both parents should aspire.
For most of the time since the plaintiff filed this case, the defendant represented himself The guardian ad litem testified that during the case the defendant had not communicated cooperatively with her, was very aggressive in his demeanor, and had been verbally abusive to her and her staff. The court found this testimony credible. The defendant's conduct in court once, for example,[4] demonstrated his difficulty accepting decisions that he does not like or understand. The guardian ad litem also testified, however, that since the recent appearance of his new attorney, the defendant's conduct has improved. The defendant's demeanor at trial was exemplary. The court thus infers that despite whatever communication deficits he has exhibited in the past, the defendant also has the capacity to adapt and change that behavior.
The defendant's strong desire to be involved in his son's life, and to share in decisions affecting Christian, is commendable.[5] Both the family relations counselor and guardian ad litem believe that it would benefit Christian for his father to be more involved in his life, and recommended that both parties participate in post-judgment counseling to improve their communication with each other. There is no credible evidence suggesting that the defendant is an unfit parent or cannot act in his child's best interest. If his conduct and communication style CT Page 15411 become more cooperative, an order of joint custody in the future would be entirely appropriate. For the present, however, until the parents can communicate effectively, Christian's best interest requires an order of sole custody to the mother.
B. Visitation/Parenting Schedule
The plaintiff seeks continued restrictions on the defendant's parenting schedule with Christian. In addition to her claim, discussed above, of risky behavior, she offered three other principal reasons to limit the defendant's access to Christian. She claimed that he does not have a safe car; she believes his home is inadequate for overnights; and she fears he might take Christian to Belize. The defendant, on the other hand, wants to have overnight visitation with his son and to take him to Belize to spend time with his paternal grandparents and his half brother, Norman.
On many occasions during this case the plaintiff has raised the specter that the defendant would abduct her son to Belize. In the application for a temporary restraining order, for example, she alleged that she was "apprehensive" he would do so. She mentioned this same fear to the family relations counselor and the guardian ad litem and testified at trial to the same effect. There is absolutely no evidence to corroborate her claim. The family relations counselor and guardian ad litem both concluded that nothing in the defendant's behavior to date suggested such a risk.
When the plaintiff mated the defendant and decided to have children, she made a conscious decision to bear offspring who would have links to another culture than the one she herself grew up in. Christian is a child born of parents of two nationalities and two cultures. His dual ethnicity and bicultural background is part of who he is. It is important and in Christian's best interest for him to get to know all of his family, both paternal and maternal, and to become familiar with both of his cultural heritages. A groundless "apprehension" that the defendant would remove Christian from the reach of American legal process is not a sufficient reason to prevent this child from getting to know his extended family and culture. At the same time, Christian is still a young child. His introduction to his Belizean culture and background must be subject to his developmental growth and his emotional and psychological needs. Accordingly, the court's orders here will limit the ability of either party to take Christian out of the country without sufficient advance notice to the other party.
The guardian ad litem, obviously seeking to be impartial and fair to both parties, has proposed that the court limit the ability of either parent to remove Christian from Connecticut without permission of the CT Page 15412 other. This court agrees with the plaintiff that there is no need for any such restrictions on her ability to take Christian to visit his grandparents in Vermont. There is no reason, moreover, to limit the defendant's ability to take his son on trips within the United States. The court will require both parties, however, to notify the other in writing before doing so and to give the other the address and telephone numbers of the locations where parent and child will be sleeping while outside Connecticut.
The guardian ad litem has proposed phasing in one weekly overnight visitation during the next six months. The plaintiff testified at trial that she thought the defendant's present home might be too small for the minor child to spend the night. He lives in a small, one-bedroom apartment with an eat-in kitchen and bathroom. There is no credible evidence that the defendant's smaller residence is inappropriate for Christian to stay overnight. There is adequate space outside for the child to play. The size of the apartment is appropriate to and commensurate with the defendant's financial ability and his desire to live close to Christian. Some parents have more money and better estates than others after a divorce. This will be, for reasons set forth below, such an instance. The disparate financial situations of the parties, the defendant's smaller home, and the plaintiff's ability to afford a house, however, do not justify restricting Christian's access to his father. The court concurs with the testimony of the family relations counselor that it is not necessary for Christian to have a separate bedroom in the defendant's home, but the defendant does need to provide Christian with a separate bed and his own defined sleeping area. Christian's best interest also requires that the defendant obtain a safer car in which to transport the child. The court's orders here will provide the defendant with the financial resources to do so and require safe driving practices by both parents.
The plaintiff testified at trial that the defendant had often expressed his desire to bring his other son, Norman, to live with him in the United States. She expressed fear that Norman might endanger Christian. The defendant admitted at trial that Norman had played with matches and started some small fires. Attempting to minimize the danger of such play, he said that this conduct had occurred six years ago and that "as we all know, children like to play with fire." The court has no way to determine if Norman poses any present risk to Christian. To ensure Christian's safety, the defendant must be present whenever Norman and Christian are together.
C. Property and Financial Issues
"There are three stages of analysis regarding the equitable CT Page 15413 distribution of each resource; first, whether the resource is property within Section 46b-81 to be equally distributed (classification); second, what is the appropriate method for determining the value of the property (valuation); and third, what is the most equitable distribution of the property between the parties." Krafick v. Krafick, 234 Conn. 783,792-93 (1995). The court finds that all items listed on each party's financial affidavit as assets are property within the meaning of §46b-81 and hence subject to distribution by the court. The court has already made findings as to the respective value of each asset.
The court concludes that each party should keep possession of the property and assets it lists on its affidavits, with the exceptions as described below.[6] Although the assets listed on the plaintiff's affidavit are worth far more than those on the defendant's, the plaintiff acquired most of these either by gift directly to her (e.g., the Subaru) or as the fruit of her own labor. The defendant's only contribution to the acquisition of the marital home at 3 Curtis Road was the ten thousand dollars given to him by the maternal grandparents for a down payment. His earnings during the marriage, while the parties lived together, contributed toward household expenses that included mortgage payment, homeowner's insurance, and real property taxes.
The plaintiff is in a much better financial position than the defendant. She earns much greater income, with a regular cost of living increase; and her employer offers generous retirement and health insurance benefits. At present the defendant has limited income. But he has made clear his entrepreneurial aspirations. He has skill and training in mechanics and the hospitality industry. He is a hard and diligent worker. His success while working at the Mayflower Inn, though disrupted by an accusation about which this court has no information to evaluate its credibility, augurs future occupational success. Although the defendant is eight years younger than the plaintiff, neither appears to have any significant health limitation that would restrict their employability. Both appeared at trial to be highly intelligent and articulate. The defendant's limitations in English as a second language might impair his ability to succeed in careers that involved extensive writing, but there was no evidence that it has limited his occupational pursuits to date.
The defendant's financial affidavit shows that, although he has run up significant debt, he is now managing to balance income and expenses. Although the plaintiff's affidavit claims that she has more expenses than income, when one discounts her desire to set aside money for vacation expenses (an expense the defendant cannot afford to. assume) and considers the financial significance of her paying for much of Christian's child care and health insurance on a pre-tax basis and the CT Page 15414 tax benefits of owning a home, the court's orders will ensure enough income to meet her expenses, assuming the defendant pays his child care obligation.
 III — ORDERS
After considering all the statutory factors set forth in General Statutes § 46b-81 (c) as to equitable distribution of property, § 46b-82 as to alimony, § 46b-84 as to support of a minor child, § 46b-62 as to counsel fees, and § 46b-215a-1 et seq., Regs. Conn. State Agencies, as to child support, together with applicable case law and the evidence presented here, the court hereby enters the following orders:
1. Dissolution of Marriage: The marriage of the parties, having broken down irretrievably, is hereby dissolved.
2. Restoration of Birth Name: In accord with the plaintiff's amended prayer for relief, the court orders restoration of her birth name, Elizabeth Welch.
3. Custody: The plaintiff shall have sole and legal custody and primary residence of the minor child, Christian, subject to the rights of reasonable and liberal visitation by the defendant set forth below. The defendant shall be entitled to full access to all of the minor child's medical and school records. The plaintiff shall inform the defendant in advance of major issues involving the child's health, safety, welfare and education and consult with him in a good faith effort to reach a mutually agreeable decision regarding any such issue before herself making a decision. If the parties cannot reach agreement after consultation, the plaintiff shall have the authority to make the final decision.
4. Parenting Time: The defendant's right of. reasonable and liberal visitation shall include the right to take Christian to Belize, subject to the court's restrictions below. The defendant shall have parenting time with Christian as set forth below:
a. Every Monday after lunch until 6:00 p.m. Tuesday.[7] Monday overnight visitations will be phased in over the next six months, as follows:
 (1) For the first two months after issuance of this decision, the defendant will have parenting time on both days but no overnights. He will pick Christian up from preschool after lunch on both days and return Christian to his mother's by 6:00 p.m. that evening.
CT Page 15415
 (2) For the next two months, Christian shall stay overnight at the defendant's house on the first Monday of the month.
 (3) For the following two months, Christian shall stay overnight at the defendant's house on the first and third Mondays of the month.
 (4) After six months, Christian shall stay overnight with his father every Monday night.
 (5) When Christian visits with his father overnight on Monday, it is the defendant's responsibility to ensure that Christian arrives at preschool, or school, on time the next day and appropriately dressed and prepared for the school day.
 (6) Before overnight visitations begin, the defendant must provide a separate bed and a defined sleeping area for Christian.
 (7) After Christian begins formal educational programs, either kindergarten or first grade, the defendant may pick Christian up for visitation only when Christian's school day ends.
b. If the defendant is available for parenting time during school vacation weeks other than the summer, (e.g., Christmas vacation, winter vacation, spring vacation), he may have parenting time with Christian from Monday from 10:00 a.m. until Tuesday at 6:00 p.m.
c. During the summer, each party shall be entitled to two non-consecutive weeks of vacation time with the minor child. The party seeking the vacation time shall notify the other party at least thirty days before the dates of the proposed vacation time. All vacation time must be agreed upon in advance by the parties. If the parties cannot agree on vacation schedules, the plaintiff will have the final decision. If either party intends to travel out of state with the child, that party shall notify the other party of the address and telephone number where they will be staying and allow daily telephone contact with the minor child.
 (1) The defendant shall be entitled to take Christian to Belize for one of his annual vacation weeks, unless a court finds that it would be in Christian's best interest not to do so. Such right is subject to the further restrictions set forth below.
 (2) Neither party may take Christian out of the country without advance notice to the other party, as set forth below:
CT Page 15416
 (a) The guardian ad litem shall keep possession of Christian's passport.
 (b) Either party wishing to take Christian out of the United States must give both the GAL and other party thirty days advance written notice of their desire to do so.
 (c) If neither party seeks a court order in that thirty-day period to prevent the other party from taking Christian out of the country, the GAL shall deliver Christian's passport to the parent who is going out of the country. If such an action is filed, the GAL shall await the result of any such proceeding and comply with any directive a court may issue.
 (d) Any such visit outside the United States may not exceed a total of seven days. At the end of the seven-days, the party shall return the passport to the GAL.
d. The parties shall alternate the following holidays each year: (1) New Year s Day, (2) Easter, (3) July fourth, (4) Thanksgiving, and (5) Christmas.[8][9] In odd-numbered years, the defendant shall have parenting time on the holidays preceded in the previous sentence by an odd number and the plaintiff on even-numbered holidays; the opposite shall occur in even numbered years. The defendant's parenting time on these holidays shall last from 10:00 a.m. until 8:00 p.m.
e. Each of the parties shall have the right to visit with the child for at least two hours on the child's birthday if the parent would not otherwise have parenting time with the child that day.
f Christian may spend father's day with the defendant, from 10:00 a.m. until 7:00 p.m.
g. Holiday and vacation parenting time shall supercede the regular parenting schedule.
h. If the defendant is unable to bwith Christian during any of his scheduled parenting time, he shall return Christian to the plaintiff or, depending on the time, to day care or school.
i. The defendant must be present whenever Norman and Christian are together.
j. Any vehicle that either parent uses to transport the minor child shall conform with Connecticut safety standards and each parent shall follow the National Safety Council guidelines and standards relating to CT Page 15417 use of car seats.
k. Both parties shall maintain a current telephone or pager number. If a party has a telephone, the party must also have a working answering machine attached to it. Each shall advise the other of their current addresses and telephone numbers, and shall immediately inform the other of any changes.
l. Both parents shall respond to telephone, pager, voice mail, or mail communications from the other parent and keep each other informed of the child's activities.
m. Both parents shall have reasonable telephone contact with the minor child when the child is with the other parent. Reasonable shall mean at least one telephone call a day.
n. Neither parent shall permanently remove the minor child from the State of Connecticut without ninety days written notice to the other parent
o. Both parents shall treat each other with respect and courtesy. Neither parent shall make any derogatoty remarks about the other parent in front of the child or within the child's hearing.
p. Neither party shall allow Christian to be exposed to or in the presence of persons using illegal drugs or abusing alcohol. Each shall ensure that Christian is properly dressed for the activities he is engaged in and the prevailing or reasonably anticipated weather conditions.
q. Responsibility for transportation to and from parenting time: When the defendant's parenting time begins immediately after Christian has been in preschool or school, the defendant will be responsible for picking Christian up from the school to begin his parenting time. Otherwise, whichever party then has parenting time with Christian is responsible for transporting the child to the other parent for the beginning of that party's parenting time.
5. Equitable distribution of property: Each party may retain, free and clear of the other, all assets listed on their respective affidavits, except as set forth below:
a. The plaintiff shall keep her interest in the real property located on Curtis Road in Washington free of any claim by or interest in the husband. CT Page 15418
b. The plaintiff shall retain possession of the savings bank trust account she established for Christian and shall use the same for the benefit of the minor child.
c. The plaintiff shall transfer to the defendant the sum of $35,000 within 120 days of the date of this order.
d. The defendant shall remove from the marital property the trailer, boat and any personal tools of his that remain on the marital premises within thirty days of the date of this order. If he does not do so within that time period, the plaintiff may dispose of said property as she deems appropriate, without further claim to such by the defendant.
6. Financial responsibility for indebtedness: Each party shall be responsible for paying all debts listed on their respective financial affidavits, and shall indemnify and hold the other harmless thereon.
7. Health and life insurance: The plaintiff shall maintain health and dental insurance for the minor child. The provisions of Section 46b-84
(c) will apply. She shall maintain the $50,000 in life insurance that she currently has, and shall name Christian as the beneficiary thereon.
8. Alimony: Neither the husband nor the wife shall pay any alimony.
9. Child Support: The husband shall pay child support in the amount of $79.00 per week until the minor child has reached the age of eighteen or has graduated from high school, whichever is later, but in no event beyond the child's nineteenth birthday. This amount is the presumptive current support amount, based upon the child support guidelines. In addition, the parties shall pay the following percentages of unreimbursed medical and health-related[10] expenses (after the first one hundred dollars a year, which is the responsibility of the custodial parent) and of child care expenses that the plaintiff incurs in order to work: plaintiff, 79.08%; defendant, 20.92%. These percentages are computed in accordance with the child support guidelines. Based on those percentages, the defendant's child care contribution toward plaintiff's current weekly child care expenses of $186 is $39. The defendant owes a child support arrearage of $976, and under the child support and arrearage guidelines his recommended weekly arrearage payment is $16. Accordingly, the court orders the defendant to pay the plaintiff the sum of $134 per week as the total current child support award until the arrearage is repaid, and thereafter to pay the presumptive current support amount plus his percentage share of current child care expenses and of unreimbursed medical expenses in excess of $100 per year. Pursuant to General Statutes § 52-362 (b), the court enters an order for immediate wage withholding, subject to the rights of the parties after CT Page 15419 issuance of this decision to agree to an order of contingent withholding. The court finds that the defendant has previously been advised of the minimum amount of income which is exempt from withholding under state and federal law, his right to claim any applicable state or federal exemptions with respect thereto, and his right to offer any evidence as to why a withholding order effective immediately should not issue. The defendant may, upon motion to the court, offer any evidence as to why the withholding order effective immediately should not continue in effect.
10. Tax exemptions: The parties shall annually alternate the dependent tax exemption and child tax credit. The plaintiff shall be entitled to claim both for calendar year 2001, the defendant shall claim both for 2002, etc.
11. Counseling: Under new legislation, section twelve ofPublic Act 00-186 (now General Statutes § 46b-56 (g)) the court may, in making custody or visitation decisions, order a parent to engage in counseling if in the best interest of the minor child. This court finds that it is in the best interest of Christian for both his parents to participate in post-judgment counseling to assist them in facilitating communication on parenting issues, and orders the parties to do so as ordered herein. The parties shall share equally the cost of any such counseling, unless any counselor, because of the defendant's lesser income, charges him a reduced rate, in which case the parties shall pay their own individual costs for participating. They shall begin such counseling within sixty days after issuance of this decision and continue in regular counseling for at least twelve months thereafter. If either party or the GAL believes it is in Christian's best interest to continue such counseling for a longer period, they may seek an order extending the period of such counseling. If the parties cannot agree on whom to see for counseling within the next thirty days, each party and the GAL shall submit names of proposed counselors to this court for its decision.
12. Counsel and guardian ad litem fees: The parties shall, within sixty days of the date of this order, each pay one-half of the $17,267.25 fee of the guardian ad litem, or enter into an agreement acceptable to the GAL for periodic payments of such. The court expressly intends this order for payment of the GAL fee to be in the nature of support and hence, under present law, and to the extent that this court may determine it, non-dischargeable in bankruptcy.[11] Any amounts either has already paid shall count toward its one-half share. After considering the statutory factors mandated under General Statutes § 46b-62, including the respective financial abilities of the parties, and the balance of these orders the court declines to order payment of counsel fees to either party. To do so would destroy this carefully crafted mosaic. CT Page 15420
13. Guardian ad litem's continuing duties: In view of the court's orders here, the GAL shall continue to serve m that capacity for the next eighteen months, or such longer period as may be ordered by the court. Each party shall split equally any costs for future expenses incurred by the GAL in carrying out her duties under this decision.
Judgment will enter accordingly.
BY THE COURT
STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT